**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**December 5, 2003**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-20188

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MORRIS BROWN OKOLO,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
(No. H-01-765)

Before DAVIS, WIENER, and STEWART, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Morris Brown Okolo was convicted of one count of conspiracy to commit bank fraud, one count of conspiracy to launder funds, and thirty-five counts of aiding and abetting bank fraud. On appeal, Okolo (1) challenges the sufficiency of the evidence supporting his conviction, (2) contests the denial of his motion for new trial, (3) asserts that the district court erroneously admitted lay opinion testimony, and (4) disputes the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

district court's sentencing.[1]  For the reasons explained below, we affirm Okolo's conviction and sentencing.

## I.  BACKGROUND FACTS

A grand jury returned a thirty-seven count indictment against Defendant-Appellant Okolo and several codefendants.  Each defendant was charged with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 371, one count of conspiracy to launder funds in violation of 18 U.S.C. § 1956(h), and 35 counts of aiding and abetting bank fraud in violation of 18 U.S.C. §§ 1344 and 2. The charges were the culmination of an extensive investigation into an elaborate check-fraud scheme involving Bank One and other banks.

In 1999, a fraud examiner at Bank One began researching fraudulent activity relating to several line-of-credit accounts. The examiner discovered that someone had accessed each account and changed the address of record without the knowledge of the account holder.  Next, checks reflecting the false address had been ordered specifying delivery to the false address.  After the checks were delivered to the bogus address, forged checks were drawn on the account and subsequently deposited into various other bank accounts.  Then, after these checks cleared, the deposited funds

---

[1] As we struggle to comprehend much of Okolo's appellate brief, to any extent that we misapprehend Okolo's appellate points, they have been inadequately argued and thus are abandoned on appeal. See Yohey v. Collins, 985 F.2d 222, 225 (5th Cir. 1993).

were withdrawn. Bank One suffered approximately $3.7 million in losses as a result of this scheme.

Postal Inspector Matthew Boyden assisted Bank One's fraud examiner. Inspector Boyden traced the checks and account activity, which led him to a number of co-conspirators who then cooperated with law enforcement. Eventually each such co-conspirator "flipped" in exchange for a lighter sentence. Inspector Boyden ultimately reached James Anderson who also agreed to cooperate.

Anderson divulged that, in the early 1990s, his sister, Patricia Roebuck, dated Okolo, with whom Anderson became acquainted. Although Okolo and Roebuck stopped dating after a few years, Anderson remained friendly with Okolo. In 1999, Anderson was suffering financial difficulties and approached Okolo to find out if he knew of a way that Anderson could make money. Okolo offered to pay Anderson for locating people who would agree to deposit fraudulent checks into their bank accounts and withdraw the funds after the checks cleared. From that time until he was arrested, Anderson's extensive involvement in the scheme included recruiting depositors, acting as an intermediary between Okolo and the depositors, and transmitting proceeds of the deposited fraudulent checks to Okolo. Anderson was arrested after he delivered checks from Okolo to one of the depositors. Anderson later confessed to Inspector Boyden and agreed to cooperate by

3

recording conversations with Okolo and participating in a sting operation.[2]

Roebuck was also involved in the scheme. She testified that on three or four occasions in 2001, Okolo came to her apartment and asked her for assistance. She stated that Okolo acknowledged to her that he had ordered fraudulent checks while pretending to be the account holder. Roebuck helped Okolo write checks, occasionally filling out the names of the payees or amounts of the checks, and signing the checks as Okolo directed. According to her, Okolo sometimes filled out the checks himself and asked her to sign them. For her assistance, Okolo paid Roebuck a few hundred dollars for each check.[3]

In September 2001, Anderson set up a meeting with Okolo at the direction of law enforcement agents, ostensibly to deliver pay-off money that Anderson had purportedly received from another scheme participant. When Okolo arrived at the scene, Anderson got out of his car, unlocked its trunk, removed the funds, and got into Okolo's vehicle. When Anderson gave Okolo the pay-off money, law enforcement officers — wearing jackets identifying them as agents from various federal and state agencies — announced their presence

---

[2] Anderson pleaded guilty to conspiracy and bank fraud and, pursuant to a written plea agreement, agreed to testify about his involvement in the check-fraud scheme. In return, Anderson hoped to receive a lighter sentence.

[3] The government solicited Roebuck's cooperation and testimony in exchange for an immunity agreement barring prosecution for her involvement in the scheme.

and attempted to surround Okolo's vehicle. In response, Okolo accelerated, driving over a curb and sidewalk, cutting through a parking lot, and racing away from the scene. After a brief chase, however, officers arrested Okolo and recovered the pay-off money.

## II. DISCUSSION

### A. STANDARDS OF REVIEW

We apply different standards of review to the various issues raised by Okolo. To Okolo's challenge to the sufficiency of the evidence supporting his conviction, we apply a reasonableness standard; that is, we ask whether any reasonable trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt.[4] We apply the deferential abuse-of-discretion standard in reviewing the district court's denial of Okolo's motion for new trial based on newly discovered evidence.[5] We apply that same standard in reviewing Okolo's evidentiary complaint that the district court improperly admitted lay opinion testimony.[6] Finally, we review de novo the district court's application and interpretation of the sentencing guidelines, and we review its findings of facts for clear error.[7]

---

[4] United States v. Reyna, 148 F.3d 540, 543 (5th Cir. 1998).

[5] United States v. Villarreal, 324 F.3d 319, 325 (5th Cir. 2003).

[6] United States v. Sanchez-Sotelo, 8 F.3d 202, 210 (5th Cir. 1993).

[7] United States v. Jimenez, 323 F.3d 320, 322 (5th Cir. 2003).

**B.** **SUFFICIENCY OF THE EVIDENCE**

After the government's case-in-chief and again at the close of evidence, Okolo moved for a judgment of acquittal on all counts, pursuant to Federal Rule of Criminal Procedure 29(a). In both instances, the district court denied Okolo's motion.

**1. Conspiracy to Defraud and Bank Fraud**

Okolo's challenge to the sufficiency of the evidence supporting his conviction for conspiracy to commit bank fraud (count 1) and aiding and abetting bank fraud (counts 3-37) amounts to little more than a request that we reexamine the credibility of the witnesses who testified against him. For example, Okolo points to the bias of the government's two principal witnesses, Anderson and Roebuck, and complains that "Anderson testified that he wanted leniency to avoid dying in prison. Patricia Roebuck testified that she wanted to help her brother."

It is universally recognized that we resolve all credibility determinations and reasonable inferences in favor of the verdict.[8] Beyond his conclusional assertion that Anderson's and Roebuck's testimony cannot be considered reliable, Okolo's appellate brief fails to articulate why the evidence adduced at trial is not sufficient to support his conviction on these counts. We cannot

---

[8] United States v. Resio-Trejo, 45 F.3d 907, 911 (5th Cir. 1995).

re-weigh the evidence or independently assess the credibility of the witnesses,[9] so this argument is frivolous.

### 2.   Conspiracy to Launder Money

In count 2, the government charged Okolo with engaging in a conspiracy to launder money based on the manner in which he conducted financial transactions with the proceeds of the check-fraud scheme.  The government proffered two alternative theories to prove that Okolo had the requisite intent.  First, the government advanced a promotion theory under § 1956(a)(1)(A)(1), arguing that Okolo managed the bank fraud scheme with the intent either to promote or further the bank fraud.[10]  Second, the government alleged a concealment-of-proceeds theory under § 1956(a)(1)(B)(i), asserting that Okolo intended to conceal or disguise the nature, location, source, or ownership of the funds derived from the check-fraud scheme.[11]  We glean from Okolo's appellate brief two distinct challenges to the government's alternative theories.  Okolo asserts that the government failed to prove that he had the necessary specific intent to support a conviction under the promotion theory.  Regarding the concealment-of-proceeds theory, Okolo advances that it is an "unwarranted reaching" to infer that concealment occurred

---

[9] United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996).

[10] See United States v. Rivera, 295 F.3d 461, 467 (5th Cir. 2002).

[11] See United States v. Pipkin, 114 F.3d 528, 533-34 (5th Cir. 1997).

7

just because some of the fraudulently obtained checks were payable to cash.

Again, we need not engage in an extended discussion of these contentions as our review of the record confirms that there is more than ample evidence to support the jury's conviction verdict under either theory. The jury easily could have inferred from the evidence that Okolo used proceeds from the check-fraud scheme to pay various participants in the operation —— Roebuck and Anderson, for example —— to perpetuate the scam and ensure its success. The jury just as easily could have concluded that Okolo and the other conspirators conducted the financial transactions to conceal his ownership of and control over the unlawful proceeds. From the scheme's very nature —— Okolo's employment of third parties to forge and deposit the checks rather than doing so himself —— the jury could have deduced that the scheme was designed to avoid Okolo's being detected. His challenge to the sufficiency of the evidence supporting his conviction for conspiracy to launder money is without merit.

## C.   DENIAL OF MOTION FOR NEW TRIAL BASED ON NEW EVIDENCE

A district court may grant a motion for new trial based on newly discovered evidence "if the interests of justice so require."[12] To prevail on such a motion, Okolo had to show that: (1) The evidence was newly discovered and was unknown to him at the

---

[12] FED. R. CRIM. P. 33.

time of trial; (2) his failure to detect the new evidence earlier was not the result of a lack of diligence on his part; (3) the new evidence was not merely cumulative or impeaching; (4) the new evidence was material; and (5) the new evidence, if introduced at a new trial, would probably produce an acquittal.[13]

Okolo contends that, after trial, he learned of evidence that three Bank One employees had supplied confidential account information of Bank One customers —— individuals whose lines-of-credit were tapped —— directly to Anderson. At trial, though, the evidence had shown that Okolo received the account information and subsequently provided the completed checks to Anderson. Okolo argues that this "new" evidence controverts Anderson's testimony and demonstrates that Anderson's involvement with the scheme was far deeper than he led the jury to believe. Okolo argues further that this evidence supports his defense theory that he had no involvement with the scheme whatsoever and that it was orchestrated by Anderson and the other defendants.

The district court correctly ruled that Okolo was not entitled to a new trial. In ruling against Okolo, the district court determined that, even though this information was new to the government, it was not new to Okolo because he had dealt directly with one of the Bank One employees to obtain confidential bank customer information. But even if we were to assume arguendo that

_____

[13] See Villarreal, 324 F.3d at 325 (citations omitted).

9

this information was newly discovered, it was essentially impeachment evidence to undermine Anderson's credibility. Furthermore, we are not convinced that this "new" evidence could raise a reasonable doubt about Okolo's guilt, and, if introduced at a new trial, would probably produce an acquittal. Okolo has failed to carry his burden of showing that the district court abused its discretion when it denied his motion for new trial, so Okolo is not entitled to relief on this issue.

**D.    IMPROPER ADMISSION OF LAY OPINION TESTIMONY**

Over an objection by Okolo, the district court allowed Roebuck to testify about whether the handwriting on some of the forged checks was that of Okolo. He contends that this was error because the government did not lay a predict qualifying Roebuck as an expert on handwriting.

The government was not obligated to elicit <u>expert</u> testimony to demonstrate that the handwriting on the forged checks was Okolo's.[14]

---

[14] In response, the government partly relies on Rule 901's recognition that a non-expert may give his opinion about the genuineness of handwriting based on "familiarity not acquired for the purpose of litigation." FED. R. EVID. 901(b)(2). Rule 901 addresses what is necessary to <u>authenticate</u> a document before it can be admitted into evidence. That rule does not short-circuit the need for the underlying non-expert testimony to conform to Rule 701. <u>See</u> <u>United States v. Scott</u>, 270 F.3d 30, 48-50 (1st Cir. 2001) (explaining the relationship between Rules 901 and 701 in the authentication and admission of documents containing handwriting). <u>See also</u> 31 WRIGHT & GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 7103, at 26 (2000) (noting that non-expert opinions offered under Rule 901(b)(2) to authenticate handwriting are still subject to the proscriptions of Rule 701). Here, Okolo is not questioning the admission of the forged checks into evidence.

Federal Rule of Evidence 701, which governs non-expert opinion testimony, requires such testimony to be based on the witness's own perceptions. In this context, Roebuck could serve as a Rule 701 witness for the government and testify about whether the handwriting was Okolo's, as long as her testimony was based on her own first-hand knowledge or observations.[15] This requirement is satisfied here. Roebuck said that she was familiar with Okolo's handwriting because she dated him for two years and because she observed him writing his name and signing documents. The district court did not abuse its discretion in allowing Roebuck to testify about Okolo's handwriting.

## E. SENTENCING ISSUES

Okolo raises two separate sentencing issues, one challenging a two-level increase under USSG § 3C1.2 and the other challenging a four-level increase under USSG § 3B1.1(a). We are not persuaded by either argument.

### 1. Two-Level Enhancement Under USSG § 3C1.2

First, Okolo challenges the district court's two-level increase under USSG § 3C1.2 for his speeding away from arresting officers. Section 3C1.2 prescribes a two-level increase "[i]f the defendant recklessly created a risk of death or serious bodily

---

[15] FED. R. EVID. 701 advisory committee's note to 1972 proposed rules. See also United States v. Rea, 958 F.2d 1206, 1215 (2d Cir. 1992).

injury to another person in the course of fleeing from a law enforcement officer."

The application notes to § 3C1.2 direct the court to the definition of "reckless" found in § 2A1.4, the involuntary manslaughter guideline.[16] "Reckless" under § 2A1.4 "refers to a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation."[17]

Okolo maintains that he could not have been "aware of the risk created by his conduct" because he did not realize that he was fleeing from law enforcement officers. Okolo notes that the officers who attempted to apprehend him and subsequently gave chase drove unmarked cars. Okolo adds that, because this incident occurred on the afternoon of September 11, 2001 —— a day, as he describes it, when "no one in the country knew who was who" —— his act of fleeing does not support a § 3C1.2 enhancement. Okolo asks us to adopt the reasoning of United States v. Hayes, in which the Sixth Circuit held that "a § 3C1.2 enhancement is inapplicable if

_____

[16] USSG § 3C1.2, app. note 2.

[17] USSG § 2A1.4, app. note 1.  See also Jimenez, 323 F.3d at 323.

12

the defendant did not know it was a law enforcement officer from whom he was fleeing."[18]

In this case, we need neither adopt nor reject Hayes because we review a district court's factual findings for clear error,[19] and three facts foreclose Okolo's argument. First, agents surrounded Okolo's car immediately after he accepted Anderson's pay-off. Second, when they did this, the agents shouted "Police! Stop! Freeze!" And, third, as he drove away, Okolo yelled to Anderson, "You set me up!" These facts demonstrate that Okolo realized full well that he was fleeing from law enforcement officers. We find no error in the district court's factual findings or in its application of the § 3C1.2 enhancement.

### 2. Four-Level Enhancement Under § 3B1.1(a)

Okolo's final challenge is directed at the district court's four-level increase under USSG § 3B1.1(a) for his leadership role in the offense. On this point, he includes a request that we hold that the district court's application of § 3B1.1(a) violates Apprendi v. New Jersey.[20]

> a. Factual Support for Concluding that
> Okolo had a Leadership Role

---

[18] 49 F.3d 178, 183-84 (6th Cir. 1995). See also United States v. Moore, 242 F.3d 1080, 1082 (8th Cir. 2001); United States v. Sawyer, 115 F.3d 857, 859 (11th Cir. 1997).

[19] Jimenez, 323 F.3d at 322.

[20] 530 U.S. 466 (2000).

13

In this circuit, "[t]he application of § 3B1.1 is a factual finding reviewed only for clear error."[21] The Sentencing Guidelines direct a court to increase a defendant's offense level by four "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."[22] According to § 3B1.1's application notes, the sentencing court should consider:

> the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercise over others.[23]

The probation officer recommended the enhancement because the evidence showed that most of the fraudulently obtained checks were delivered to bogus addresses under Okolo's control. In addition, Okolo caused the signatures of Bank One account holders to be forged on the checks, and he arranged for recruited depositors to be listed as the payees on the checks. The checks passed from Okolo to Anderson and from him to the scheme's participants who deposited the forged checks into their accounts. Once the cashed

---

[21] United States v. Fullwood, 342 F.3d 409, 415 (5th Cir. 2003). Okolo contends that our review should be de novo, pursuant to United State v. McGregor, 11 F.3d 1133, 1138 (2d Cir. 1993), but here, the exercise of de novo review would not affect the outcome.

[22] USSG § 3B1.1(a).

[23] USSG § 3B1.1, app. note 4.

14

funds were withdrawn, the proceeds were sent back up the line, through Anderson, to Okolo. Including Okolo, seven defendants participated in the check-fraud scheme. These facts undeniably support the district court's assessment of § 3B1.1(a)'s four-level enhancement.

 b. Apprendi and Leadership Enhancement

The last argument that Okolo advances in his effort to avoid enhancement under § 3B1.1(a) is that the issue of leadership should have been charged as an element in the indictment and submitted to the jury under Apprendi. He reasons that such a role increase could have elevated his sentence above the prescribed statutory maximum.[24] We have read Apprendi to hold that "a fact used in sentencing that does not increase a penalty beyond the statutory maximum need not be alleged in the indictment and proved to a jury beyond a reasonable doubt."[25] The application of § 3B1.1(a) enhancement did not therefore violate Apprendi, because Okolo's sentence was below the statutory maximum applicable to each count. Okolo's Apprendi challenge is without merit.

---

 [24] Okolo's reliance on United States v. Fields, 251 F.3d 1041 (D.C. Cir. 2001), is misplaced. The Fields Court held that Apprendi does not apply because "a leadership enhancement based on a role-in-offense finding is not a fact that increases the penalty for a crime beyond the prescribed statutory maximum." Id. at 1046 (quotations omitted).

 [25] United States v. Keith, 230 F.3d 784, 787 (5th Cir. 2000) (emphasis added). Accord United States v. Moreno, 289 F.3d 371, 372 (5th Cir. 2002); United States v. McIntosh, 280 F.3d 479, 484 (5th Cir. 2002).

15

### III. CONCLUSION

For the foregoing reasons, Okolo's conviction and sentence are AFFIRMED.