UNITED STATES of America, Appellee,

v.

Mordechai SAMET and Chaim Hollender, Appellants.

Docket Nos. 03–1420(L), 03–1433(CON).

United States Court of Appeals, Second Circuit.

Argued: Oct. 21, 2004.

Decided: Sept. 11, 2006.

Andrew Citron, Of Counsel, New York, NY, for Appellant Hollender.

Maria A. Barton, Assistant United States Attorney (David N. Kelley, United States Attorney for the Southern District of New York, Maria B. Feinzig, Cathy Seibel, Laura Grossfiled Birger, Celeste L. Koeleveld, Assistant United States Attorneys), New York, NY, for Appellee.

Before: JACOBS, SOTOMAYOR, and HALL, Circuit Judges.

HALL, Circuit Judge.

Appellants Mordechai Samet and Chaim Hollender appeal from judgments of conviction in the United States District Court for the Southern District of New York (McMahon, *J.*). Both were indicted for conducting and participating in a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), through a pattern of activity including mail, wire, and bank fraud, and money laundering. In addition to the substantive RICO count, the indictment charged Appellants with various violations of Title 18 of the United State Code corresponding to the predicate acts of the RICO count.[1] The first trial ended in a mistrial. *See United States v. Samet,* 207 F.Supp.2d 269 (S.D.N.Y.2002). A second trial—the subject of this appeal—resulted in the conviction of both Appellants on numerous counts. Following conviction, Samet was sentenced principally to 327 months' imprisonment and five years of supervised release and Hollender to 151 months' imprisonment and five years of supervised release.

Most of Appellants' arguments on appeal are disposed of by summary order also filed today. We write separately here to address Hollender's claim that the district court erred by refusing to strike lay opinion testimony identifying his handwriting on certain documents.

## I. Background

This case involves a racketeering enterprise which, over a number of years, engaged in a host of fraudulent schemes and money laundering. The government introduced a substantial number of documents and materials used in connection with the fraudulent schemes and money laundering. These documents were seized from various

---

1. Specifically, Hollender and Samet were charged with violating 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1342 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1956(h) (money laundering). Samet was also charged with violating 18 U.S.C. §§ 286, 287 (false claims).

offices in the Kiryas Joel community of Monroe, New York, out of which the enterprise operated. Many of these documents were admitted at trial either as business records or as evidence seized from the enterprise's offices.

At trial the government called as a witness United States Postal Inspector Patricia Thornton. Thornton became involved with the investigation of Samet and Hollender in June 1999, and, with the exception of a five-month hiatus, spent eighty percent of her time over the next three years on the case. She testified that, during that time, she became familiar with Hollender's handwriting by viewing documents such as his passport, driver's license, post-arrest documents, and a check register for an account in his name. She offered her lay opinion that certain signature and handwriting samples shown to her at trial were written by Hollender. Thornton testified she had also become familiar with Samet's handwriting through examining similar types of documents, and testified that in her opinion certain signatures and handwriting samples shown to her were his. Her certainty regarding her identification of the two defendants' handwriting, however, varied significantly.

At one point during her direct examination as to Samet's handwriting, Thornton was shown a group of signatures and asked whether they looked like they were written by the same person. She responded that just a few appeared to be in a different hand. When asked which ones, Thornton identified some as being Samet's but asked to review her notes to identify the others. After refreshing her recollection with the notes, she identified some of the other signatures as Samet's but testified that she was unsure about the remainder.

On cross-examination, Thornton's ability to identify Samet's handwriting worsened.

She repeatedly declined to offer her opinion without referring to the known exemplars. Indeed, she testified "I have never just looked at his signature and decided that. I have always compared it to other documents." She even admitted that the jurors had as much ability as she did to identify Samet's signature. On re-cross, Thornton continued to falter. On several occasions she was unable to identify samples of Samet's writing without comparing them to known exemplars.

Thorton's testimony regarding Hollender was just the opposite. She testified that she was familiar with his writing and was willing to offer opinions without needing to refresh her recollection. In fact, on direct examination she was able to identify at least twenty-one samples as having been written by Hollender without asking to refresh her recollection, and only once during cross-examination did she ask to review her notes regarding Hollender. Further, on cross examination, she identified an additional sample of Hollender's handwriting, and two more on redirect.

Samet—joined by Hollender—thereafter moved to strike Thornton's opinion testimony identifying their handwriting. After receiving letter briefs on the issue, the district court struck Thornton's testimony regarding Samet's handwriting, holding that Thornton was not sufficiently familiar with the handwriting and her testimony was thus not helpful to the jury. The court declined to strike Thornton's testimony regarding Hollender, however, finding those identifications to be proper. This appeal followed. Hollender argues that the district court erred by admitting Thornton's opinion testimony because her familiarity with his handwriting was gained solely for purposes of litigation in violation of Federal Rule of Evidence 901(b)(2) and because Thornton was not

sufficiently familiar with his handwriting to be able to offer a lay opinion.

## II. Discussion

■ We write to address the issue of what standard to apply to the admission of lay witness testimony offered to authenticate handwriting. Federal Rules of Evidence 901(b)(2) and 701 are particularly relevant to our analysis of this issue. Rule 901(b)(2), which deals with the authentication and identification of a document as a condition of its admissibility, provides that the authenticity of a handwriting sample may be proven by "[n]onexpert opinion . . . based upon familiarity not acquired for purposes of the litigation." Rule 701 provides:

> [Where a] witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed.R.Evid. 701.

Relying on the First Circuit's decision in *United States v. Scott*, 270 F.3d 30 (1st Cir.2001), the district court held that lay opinion testimony offered to authenticate handwriting must comport with both Rule 701 and Rule 901(b)(2). Applying those Rules, the district court found that Thornton's familiarity with Hollender's handwriting was not acquired for purposes of litigation, within the meaning of Rule 901(b)(2), and that she did not give "expert-like testimony" that would be inappropriate under Rule 701. *United States v. Samet*, No. 01 CR 216, slip op. at 7 (S.D.N.Y. Nov. 18, 2002).

■ "The district court's interpretation of the Federal Rules of Evidence is given plenary review." *Hathaway v. Coughlin*, 99 F.3d 550, 555 (2d Cir.1996). Application of the rules, however, is committed to the district court's broad discretion. Thus, we will reverse only where a ruling to admit or exclude evidence is "manifestly erroneous" and as such constitutes an "abuse of discretion." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 100 (2d Cir.1995). We agree with the district court's analysis and its reliance on the rationale of the *Scott* decision. Accordingly, we hold that lay witnesses who testify as to their opinion regarding someone's handwriting must not only meet the strictures of Rule 701, but must also satisfy Rule 901(b)(2) and have a familiarity with the handwriting which has not been acquired solely for purposes of the litigation at hand. We also hold that the district court did not abuse its discretion in admitting Thornton's testimony that authenticated Hollender's handwriting.

In *Scott*, an IRS agent testified that over the course of an investigation he had seen numerous examples of the defendant's handwriting and opined that certain documents already in evidence were written by the defendant. *Scott*, 270 F.3d at 48. The defendant in *Scott* made the same objections to the district court that Hollender makes here, namely, that the IRS agent had acquired familiarity with his handwriting for purposes of litigation and that he lacked sufficient familiarity with that handwriting to testify. *Id.* The district court allowed the agent to testify, and he identified certain signatures and handwriting samples as those of the defendant. *Id.*

In affirming the district court's ruling, the First Circuit held that in order for a lay witness to testify as to the authenticity of another's handwriting, both Rules 701

and 901(b)(2) must be satisfied, and that because the agent became familiar with the defendant's handwriting "not for the purpose of testifying, but instead for the purpose of solving a crime," *id.* at 50, his testimony was properly admitted.

Here, the government argued both before the district court and this Court that Rule 901(b)(2) should not apply on the particular facts of this case because Rule 901 deals with "authentication or identification as a condition precedent to admissibility," and all of the documents at issue had already been admitted into evidence pursuant to Rule 901 either as business records or as documents seized from the enterprise's offices. This argument misses the point, however, because the documents containing Hollender's handwriting and signatures had been offered and received only as evidence of the various schemes undertaken by the RICO enterprise and not as evidence of Hollender's involvement and connection to that enterprise. In other words, prior to Thornton's testimony the documents were authenticated, by proof of proper chain of custody, as documents seized from the enterprise's offices, thus linking them to the enterprise. Those documents had not been authenticated, however, as evidence that tended to prove that the handwriting and signatures were Hollender's. *See Scott,* 270 F.3d at 49. To authenticate it as such, and thus admit the evidence for the purpose of linking Hollender to the enterprise, Thornton's opinion testimony connecting Hollender to the handwriting in question had to comport with the requirements of Rule 901(b)(2).

Even if we were not to consider separately whether Thornton's testimony comports with Rule 901, as the government requests, we think that the limits of 901(b)(2) should nonetheless be incorporated into Rule 701's requirement that lay opinion testimony be helpful to the jury. *See Scott,* 270 F.3d at 49 n. 15 (noting that "even if ... testimony was not authentication within the meaning of Rule 901, we think that Rule 701's requirement that lay opinion testimony be helpful to the jury would be best read in light of the limits Rule 901(b)(2) places on lay opinion testimony regarding handwriting"). The purpose of Rule 701 is to allow opinion testimony where it would be of some value, and exclude it where it would prove a waste of time. *See* 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6252 (1997). A lay witness who lacks prior familiarity with a person's handwriting and forms an opinion on it for the first time in preparation for testimony as a witness does not offer helpful testimony. Not only does such a witness fail in bringing to bear some previously gathered familiarity with the handwriting, but the jury is equally capable of making the same comparisons. *See* 31 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 7107 (1997) ("Where a lay witness bases a handwriting opinion on examplars reviewed for purposes of the litigation, the witness brings no more to that analysis than does the trier of fact."); *Scott,* 270 F.3d at 50 ("[S]uch a comparison could be made as easily by the jury as by the witness. Therefore, lay witness testimony without familiarity would not be helpful to the jury and would be prohibited by Rule 701 even if Rule 901 did not exist.").

Incorporating Rule 901(b)(2)'s limits into Rule 701 also helps maintain a critical difference between lay and expert opinion testimony. While "[a] lay witness may not enter court, see for the first time two samples of handwriting, and identify the contested sample as written by the same person as the previously authenticated sample," *Scott,* 270 F.3d at 50, that is precisely what an expert is charged with

doing. Thus, we hold that a lay witness who testifies as to her opinion regarding someone's handwriting pursuant to Rule 701 must satisfy Rule 901(b)(2)'s command that her familiarity with the handwriting was not acquired solely for purposes of litigation.

Turning to the facts of this case, that standard is easily met here. Thornton became familiar with Hollender's writing over the course of her investigation—an investigation that lasted several years and encompassed eighty percent of her work time. Over those many months, she viewed various documents containing Hollender's writing including his passport, driver's license, check register, and post-arrest documents. Thus, prior to the litigation, her opportunity to become familiar with Hollender's handwriting was no less (and little different) than if she had been his accountant, employee or family member. It cannot be said, therefore, that her familiarity with Hollender's writing was gained for "purposes of litigation." Rather, it ensued from her significant involvement with the investigation and work in "solving a crime." *See Scott,* 270 F.3d at 50. In this regard, Inspector Thornton is similar to the agent in *Scott,* who, through his own investigation, gained familiarity with the defendant's handwriting by observing letters, court pleadings, signature cards opening bank accounts, money orders, applications to file tax returns, a driver's license, a pilot's license, and forms signed as part of booking procedures. *Id.* at 48. Accordingly, Thornton's testimony comported with the requirements of both Rule 701 and Rule 901(b)(2).

Further, Hollender offers no legal support for his argument that he was prejudiced by the district court's decision to strike Thornton's testimony regarding Samet but not her testimony about him. The record clearly supports the district court's distinction between Thornton's testimony about Hollender and her testimony about Samet. In testifying about Samet's handwriting, Thornton repeatedly declined to offer her opinion as to the authenticity of certain documents without the aid of known exemplars. She further admitted that in developing her opinion she always made side-by-side comparisons and never looked at his signature alone. Thornton even went so far as to admit that the jurors had as much ability as she did to identify Samet's handwriting.

Thornton's testimony regarding Hollender's handwriting, however, was far different. Not only did she indicate that she was familiar with his handwriting, but she was able to offer opinions identifying it without reviewing her notes or examining the known exemplars. According to the district court, she without hesitation identified at least twenty-one signatures or handwriting samples on direct examination, one on cross-examination, and two more on re-direct. Given the qualitative difference between Thornton's testimony about Samet's handwriting and her testimony about Hollender's, the district court's decision to strike the testimony regarding Samet cannot be considered unwarrantedly prejudicial to Hollender, particularly so because the district court also admonished the jury that Thornton had no special expertise and that the jury was free to make independent judgments about the handwriting.

The district court did not abuse its discretion when it refused to strike Thornton's testimony.[2] *See, e.g., United States v. Tipton,* 964 F.2d 650, 655 (7th Cir.1992)

---

**2.** While we find that the district court did not abuse its discretion in admitting Thornton's testimony, we do not take the position that

the district courts should or must admit such testimony, or that it would be an abuse of discretion to exclude it.

(where witness was familiar with "[defendant's] handwriting and signature as a result of observing many of the ... documents [the witness] prepared" that witness was "qualified to testify regarding [defendant's] signature and handwriting"); *United States v. Barker*, 735 F.2d 1280 (11th Cir.1984) (affirming district court's decision to admit lay opinion testimony of two of defendant's co-workers who testified that they were familiar with the defendant's handwriting). *Cf. Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171 (2d Cir.2004) (district court abused its discretion when it admitted testimony not based entirely on witness' perceptions).

For the foregoing reasons, and those stated in the summary order filed contemporaneously with this opinion, the judgment of conviction and sentence of the district court is AFFIRMED.