RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0091p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-1288

ROBBY NAKIA HARRIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cr-20314—Denise Page Hood, District Judge.

Argued: March 4, 2015

Decided and Filed: May 13, 2015

Before: CLAY, GILMAN, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Brandy Y. Robinson, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant. Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Brandy Y. Robinson, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant. Susan E. Gillooly, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. Defendant Robby Harris appeals his conviction for mailing a threatening letter to United States Congresswoman Candice Miller, in violation of 18 U.S.C. § 876(c). At trial, the government elicited testimony from three witnesses, each of whom

1

identified Harris as the author of the letter based on their familiarity with his handwriting.  On appeal, Harris argues that the witnesses' testimony violated Federal Rule of Evidence 701 and impermissibly encroached upon the jury's duty to determine whether Harris mailed the threatening letter.  For the reasons that follow, we **AFFIRM** Harris' conviction and sentence.

## I.

In October 2012, the district office of United States Congresswoman Candice Miller received a threatening letter.  The author of the letter threatened, among other things, to kill Congresswoman Miller and members of her family if she did not send one million dollars.  The letter was written in distinctive handwriting, and the return address was a residence in Pontiac, Michigan.  Congresswoman Miller's office contacted the authorities, and the FBI began investigating.

FBI Special Agent Juan Herrera learned that the return address belonged to a woman named Cynthia Hiller.  Agent Herrera interviewed Hiller, and she denied writing the letter.  She explained to Agent Herrera that she believed that the letter was sent by Robby Harris, one of her neighbors in the apartment complex.  Hiller provided Agent Herrera with two love letters that Harris had written and hand-delivered to her.

Hiller received the letters from Harris about a year prior to being interviewed by Agent Herrera.  She had no interest in Harris and found the letters disturbing.  After receiving the second letter, Hiller went to Harris' apartment, where he lived with his mother.  She expressed to both of them that she wanted the letters to stop, and Harris' mother assured her that they would.

Shortly thereafter, the postal carrier assigned to the apartment complex gave Hiller a threatening letter that was addressed to United States Senator Debbie Stabenow and bore Hiller's return address.  The letter and the envelope were written in distinctive and almost illegible writing.  The letter was also signed with Hiller's name even though Hiller denied having written or signed the letter.

Although Hiller did not recognize the handwriting at that time, the postal carrier did.  She explained to Hiller that it matched the writing of a man who was on her former postal route.  Hiller then instructed her postal carrier that if she ever again saw that handwriting with Hiller's

return address on a piece of mail, she should put it in Hiller's mailbox rather than deliver it to the addressee.

Hiller soon received several letters that she did not write but which nonetheless listed her return address. The letters also contained similar distinctive and nearly illegible writing. She also began to receive unsolicited magazine subscriptions. At one point, Hiller received a letter from RBC Ministries responding to an inquiry in which someone purporting to be Hiller claimed that she was a prostitute and needed help.

Theresa Conner-Orsette ("Orsette") was the postal carrier assigned to the route that included Hiller's address. Orsette had previously become familiar with Harris and his handwriting when assigned to a different route that, coincidentally, included the residence where Harris was living with his mother. During that time, Harris often handed Orsette items to mail. Harris would also give Orsette tear-out subscription cards from magazines—sometimes ten or fifteen per week—and direct her to send them along with other magazine order forms that were in the outgoing mailbox. Those subscription orders typically had another person's name on them but no return address.

When Orsette was transferred to the postal route that included Hiller's apartment, she again encountered Harris and his mother, who had moved to a neighborhood within her new route. At his new address, Harris continued mailing the magazine subscription forms, placing them in the outgoing box. Orsette recognized the handwriting as being identical to the prior magazine card mailings.

After speaking with Hiller, Agent Herrera interviewed Harris and his mother. Although Harris denied writing the letters, his mother showed Agent Herrera a box of envelopes, a notepad with yellow-lined paper, and stamps that were similar to those used in the correspondence sent to Congresswoman Miller. Agent Herrera subsequently obtained a search warrant for Harris' residence; during the search, the FBI recovered the box of envelopes, the stamps, and the notepad.

The FBI subjected the various letters to forensic analysis. No fingerprints or DNA were found on the letter sent to Congresswoman Miller, but two of the other letters had saliva on them

with Harris' DNA. Those letters had both been sent using Hiller's return address and were written in the same distinctive handwriting as the Miller letter. A third such letter, also written in that distinctive handwriting, contained Harris' fingerprint.

Harris was indicted in federal district court for one count of mailing threatening communications, in violation of 18 U.S.C. § 876(c). At trial, the court admitted into evidence the letter to Congresswoman Miller and the letters that contained Harris' DNA or fingerprint. In addition, Agent Herrera, Hiller, and Orsette all testified that they could identify Harris' handwriting on the Miller letter based on their previous familiarity with his handwriting. The jury found Harris guilty, and the district court sentenced him to a thirty-month term of imprisonment to be followed by one year of supervised release. Harris filed this timely appeal.

## II.

This case asks us to consider, for the first time, the admissibility of lay witness opinion testimony offered to authenticate or identify handwriting. The courts of appeals that have squarely addressed the issue have held that such testimony "must not only meet the strictures of [Federal] Rule [of Evidence] 701, but must also satisfy Rule 901(b)(2)." *United States v. Samet*, 466 F.3d 251, 254 (2d Cir. 2006); *accord United States v. Ali*, 616 F.3d 745, 754 (8th Cir. 2010); *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1259 (11th Cir. 2004); *United States v. Brown Okolo*, 82 F. App'x 131, 136 n.14 (5th Cir. 2003); *United States v. Scott*, 270 F.3d 30, 49 (1st Cir. 2001); *United States v. Tipton*, 964 F.2d 650, 654–55 (7th Cir. 1992). We begin by examining both rules.

Rule 701 delineates the scope of admissible opinion testimony by a lay witness. The rule provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. "In applying Rule 701, the modern trend among courts favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 240 (6th Cir. 2010) (internal quotation marks omitted).

Rule 901 prescribes the manner in which evidence can be authenticated or identified. *See* Fed. R. Evid. 901(a). Rule 901(a) states that evidence is admissible if there is satisfactory corroboration that the evidence is what it purports to be. *United States v. Kalymon*, 541 F.3d 624, 632 (6th Cir. 2008). Rule 901(b) lists examples of the type of corroboration that "satisfies the [Rule 901(a)] requirement." Fed. R. Evid. 901(b). One such example concerns handwriting. *See* Fed. R. Evid. 901(b)(2). A lay witness may authenticate or identify a piece of handwriting provided that his familiarity with the handwriting "was not acquired for the current litigation." *Id.*

In short, Rule 701 lays out the general rule regarding lay witness opinion testimony, and Rule 901(b)(2) provides the specific rule when such testimony is used to authenticate or identify handwriting. "Thus, testimony purporting to satisfy the specific requirements of Rule 901(b)(2) must also satisfy the general requirements in Rule 701." *Hall*, 367 F.3d at 1259. As the Second Circuit observed:

> The purpose of Rule 701 is to allow opinion testimony where it would be of some value, and exclude it where it would prove a waste of time. A lay witness who lacks prior familiarity with a person's handwriting and forms an opinion on it for the first time in preparation for testimony as a witness does not offer helpful testimony. Not only does such a witness fail in bringing to bear some previously gathered familiarity with the handwriting, but the jury is equally capable of making the same comparisons.

*Samet*, 466 F.3d at 255 (internal citations omitted). In other words, reading the two rules in conjunction establishes two basic principles: handwriting identification testimony is permitted only on occasions where it serves to illuminate witness testimony or assist the jury in determining a fact in issue, and the trier of fact can assess the weight to accord any handwriting identification testimony because it has knowledge of the testimony's factual underpinnings.

In the instant case, the government used the testimony of Agent Herrera, Hiller, and Orsette in its attempt to establish that the handwriting in the letter to Congresswoman Miller

belonged to Harris.  Because none of those witnesses were certified as handwriting experts, their testimony had to comply with Rule 901(b)(2).

Agent Herrera, Hiller, and Orsette all testified that, in their opinion, the letter mailed to Congresswoman Miller was authored by Harris because it was written in his handwriting.  Agent Herrera testified that he was familiar with Harris' handwriting, having reviewed Harris' handwritten love letters to Hiller in the course of his investigation into the mailing of the Miller letter.  Hiller testified that she received two handwritten love letters from Harris that he personally delivered to her.  She also testified that, per her instructions, Orsette placed letters in her mailbox that bore her return address and had the same distinctive penmanship as the love letters from Harris.  Orsette testified that she was familiar with Harris' handwriting based on the many magazine subscription forms and other pieces of outgoing mail that he had handed to her directly in her position as a postal carrier assigned to his previous address and his then-current address.

In our view, the witnesses' testimony demonstrated sufficient familiarity with Harris' handwriting to comport with Rule 901(b)(2).  As the First Circuit has explained, over time, courts have permitted "handwriting identification based on ever-looser degrees of familiarity." *Scott*, 270 F.3d at 50.  The witness does not have to observe the defendant writing; "[o]ther categories of experience can . . . demonstrate familiarity, such as seeing . . . writings purporting to be those of the alleged author when the circumstances would indicate that they were genuine." *Id.*  The Eighth Circuit is in accord, having previously held that a witness' "single exposure to an uncontested signature and single exposure to a contested one constituted adequate familiarity under Rule 901(b)(2)." *Ali*, 616 F.3d at 754; *see also United States v. Binzel*, 907 F.2d 746, 749 (7th Cir. 1990) ("While the extent of the witness' familiarity generally goes to the weight to be accorded his testimony, rather than to the admissibility, there must be a minimal factual basis from which knowledge of, and a familiarity with, another's handwriting might reasonably have been acquired.").  Here, the witnesses all testified that they had become familiar with Harris' handwriting based on letters he wrote, subscription cards he filled out, or envelopes he addressed.

Moreover, the witnesses did not gain this familiarity for purposes of this litigation. *See* Fed. R. Evid. 901(b)(2). Agent Herrera gained his familiarity in his capacity as a law enforcement officer attempting to solve a crime. *See Samet*, 466 F.3d at 256 (holding that familiarity was not gained for purposes of litigation when it resulted from law enforcement officer's investigation and work in solving a crime). Hiller gained her familiarity in her capacity as Harris' neighbor and the object of his moonstruck missives. Orsette gained her familiarity in her capacity as Harris' postal carrier.

The witnesses' opinion testimony, like all lay opinion testimony, was also required to satisfy Rule 701. Harris argues that the testimony simultaneously violated Rule 701(b) and invaded the jurors' province to draw their own conclusions from the evidence and determine his guilt or innocence. He contends that because the witnesses' familiarity with his handwriting was derived from documents that had been admitted into evidence, the jury was capable of comparing the handwriting in the threatening letter to the handwriting in the other documents known to be written by Harris, rendering the proffered testimony "unhelpful."

We have held that witness testimony is unhelpful when it addresses matters that are within the competence of the jury to understand and decide. *See Heritage Mut. Ins. Co. v. Reck*, 127 F. App'x 194, 199 (6th Cir. 2005) (quoting *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1273 (6th Cir. 1988)). In *McGowan*, the appellant challenged the district court's exclusion of opinion testimony regarding whether a contractor breached the applicable duty of care. The panel affirmed, reasoning that once the jurors heard the evidence on the scope of the contractor's duty, they were just as qualified as the proffered witness to answer the ultimate legal question of whether the contractor breached that duty. *Id.*[1] That outcome is unsurprising in light of our strong disfavor of lay opinion testimony that consists of a legal conclusion. *See, e.g., United States v. Ahmed*, 472 F.3d 427, 434 (6th Cir. 2006); *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985).

In an unpublished opinion, a panel of the Court held that lay opinion testimony is "helpful" within the meaning of Rule 701 when the witness has "enjoyed significantly more time

---

[1]The witness was offered as both a lay witness pursuant to Rule 701 and an expert witness pursuant to Rule 702. Under both rules, the opinion testimony must be helpful. *See* Fed. R. Evid. 701(b), 702(a).

to study and compare the evidence" than the jury. *United States v. Shields*, 480 F. App'x 381, 387 (6th Cir. 2012) (citing *United States v. Zepeda-Lopez*, 478 F.3d 1213, 1222 (10th Cir. 2007)); *accord Samet*, 466 F.3d at 255 (suggesting that lay opinion testimony identifying handwriting is inherently helpful when the witness has a prior familiarity with the handwriting in question). In *Shields*, the Court did not find error in the district court's admission of a police officer's lay opinion testimony regarding similarities between the tread on shoes belonging to the defendant and a photograph of shoe prints found at the crime scene. Unlike the witness in *McGowan*, the police officer gave an opinion, based on his perception, regarding a contested fact issue; he did not attempt to offer a legal conclusion couched in opinion. *Cf. United States v. Dow*, 875 F.2d 868 (6th Cir. 1989) (unpublished table decision) (per curiam) (holding that lay witness opinion testimony as to whether letters were "threatening" in an 18 U.S.C. § 876 prosecution was unhelpful because jurors could make their own determination on that legal question).

More instructive, in *United States v. McClinton*, the Court did not find an abuse of discretion when the district court allowed a witness to identify the defendant as the individual in a surveillance photograph. 972 F.2d 349 (6th Cir. 1992) (unpublished table decision) (per curiam). The witness was the defendant's supervisor at his place of employment and based his identification on an uncommon physical characteristic of the defendant and the jacket worn in the photo. The defendant argued that because he had been present in the courtroom for the duration of the trial, "the jury was capable of comparing the surveillance photograph with the defendant and arriving at its own conclusion in determining if he was the robber." *Id.* Rejecting this argument, the Court found that the evidence was properly admitted because it was rationally based on the witness' perception and helpful to the jury in determining whether the defendant in fact appeared in the photo. The jury was not required to accept the witness' testimony as conclusive; rather, since the jurors "had the surveillance photograph before them, they could evaluate the credibility of [the witness'] perception and identification." *Id.* (citing *United States v. Maddox*, 944 F.2d 1223 (6th Cir. 1991)); *see also United States v. Perry*, 438 F.3d 642, 649–50 (6th Cir. 2006).

In light of the approach taken by the Court in the cases discussed above, it cannot be said that the contested testimony in this case was unhelpful. If credited by the jury, it would aid the determination of whether Harris in fact wrote the letter, which in turn would aid the determination of whether Harris caused the letter to be mailed—the first element of the offense for which he was being tried. *See* 18 U.S.C. § 876(c). Additionally, the testimony was based on personal knowledge and susceptible to detailed cross-examination, further weighing in favor of admission. *See Harris*, 627 F.3d at 240.

Harris' reliance on *United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013), is misplaced. In that case, the defendant was convicted of conspiracy to use interstate commerce facilities in the commission of murder for hire, in violation of 18 U.S.C. § 1958. We vacated the conviction, holding that an FBI agent who testified on behalf of the government gave inadmissible and prejudicial lay testimony under Rule 701. The agent was put on the stand to explain the meaning of certain code words used in recorded phone conversations and to identify the voices and nicknames of the participants. However, the witness began to make substantive interpretations of the meaning of various statements, even those spoken in plain English, based on having listened to all 23,000 recorded phone calls (the vast majority of which were not admitted into evidence) and his many years of experience as an FBI agent. The Court found that the testimony contravened Rule 701 because the government did not establish a sufficient foundation for it. The agent "substantiated his responses and inferences with generic information and references to the investigation as a whole [and] . . . [h]e never specified *personal* experiences that led him to obtain his information but, instead, repeatedly relied on the general knowledge of the FBI and the investigation as a whole." *Id.* at 596. Thus, when the agent "interpreted those conversations on the basis of his listening to 'all of the calls,' the jury had no way of verifying his inferences or of independently assessing the logical steps he had taken." *Id.* at 597.

The *Freeman* court further held that the agent's testimony impermissibly told the jury what result to reach. The Court explained that much of the witness' testimony was improper because he "drew conclusions from the phone calls the jury heard as well as from thousands of other phone calls and FBI evidence the jury had no access to," and in so doing, the agent "infringed upon the role of the jury to decide what to infer from the evidence, and instead told

them what conclusions and inferences to draw based on his 'fifteen years of experience.'" *Id.* at 598.

The testimony in the instant case did not suffer from these defects. As previously discussed, Agent Herrera, Hiller, and Orsette all discussed the documents upon which they based their familiarity with Harris' handwriting, thus providing a sufficient foundation for their identification testimony. Further, the witnesses did not tell the jury what conclusions to reach; their testimony was not argument. They merely stated that based on their familiarity with Harris' handwriting and their review of the letter to Congresswoman Miller, they believed that Harris had penned that letter. The jury was able to assess the weight to give their testimony on this score because they were aware of how the witnesses came to their conclusions. Equally important, the jury was free to come to a different resolution of this fact issue precisely because many of the writings upon which the witnesses based their familiarity had been admitted into evidence. *Freeman*'s concern—that "[a]n agent presented to a jury with an aura of expertise and authority increases the risk that the jury will be swayed improperly by the agent's testimony, rather than rely on its own interpretation of the evidence"—is simply not present in this case. *Id.* at 599. As made clear by defense counsel's sole question on re-cross, Agent Herrera did not purport to be a handwriting expert. Nor did he claim to have a superior ability to compare handwriting because of his position as an FBI agent. Furthermore, he did not base his opinion on parts of the investigation or evidence unknown to the jury. The witnesses' testimony did not tell the jury to draw the ultimate conclusion that Harris knowingly mailed a threatening letter to a Congresswoman Miller; the testimony simply informed the jurors that the witnesses believed, based on their familiarity with Harris' handwriting, that Harris wrote the letter.

## III.

In sum, the handwriting identification testimony satisfied Rules 701 and 901(b)(2) and therefore was properly admitted. Accordingly, we **AFFIRM** Harris' conviction and sentence.