[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13455
_____

D.C. Docket No. 1:12-cr-00276-SCJ-JKL-6

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONATUS IRIELE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 9, 2020)

Before BRANCH, TJOFLAT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

For pill pushers and drug addicts, one part of Lakewood Avenue in south

Atlanta offered one-stop shopping.  There was a pill mill where they could get

prescriptions for their controlled substances of choice with few, if any, questions asked. And only a short walk down the street was a pharmacy that would fill those prescriptions even if there were red flags galore. The pill mill was the Atlanta Medical & Research Clinic (AMARC) and the compliant pharmacy was the Medicine Center Pharmacy (MCP).[1] Donatus Iriele and his wife, Rosemary Ofume, ran that pharmacy. Both were indicted on various charges.

A jury found Iriele guilty of conspiring with AMARC's owners and doctors to illegally dispense controlled substances, of aiding and abetting the illegal dispensing of controlled substances, and of laundering and conspiring to launder the proceeds of those illicit sales. This is Iriele's appeal.

Ofume was convicted for many of the same crimes but she has since died. As a result, we entered an order dismissing Ofume's part of the appeal as moot and remanding that part for the district court to vacate her convictions and dismiss the indictment as to her. See United States v. Koblan, 478 F.3d 1324, 1325 (11th Cir.

---

[1]The parties use that acronym for the clinic and that initialism for the pharmacy and so will we. We recognize that the use of these two types of abbreviations is not universally applauded. See, e.g., Notice of the U.S. Court of Appeals for the D.C. Circuit (January 26, 2010) ("To enhance the clarity of the brief, the court strongly urges parties to limit the use of acronyms. While acronyms may be used for entities and statutes with widely recognized initials, such as FERC and FOIA, parties should avoid using acronyms that are not widely known."); Bryan A. Garner, Legal Writing in Plain English 60–62 (2d ed. 2013) (advising legal writers to "[s]hun newfangled acronyms"). We use AMARC and MCP in this opinion because doing so nets out on the side of clarity and helps keep the opinion flowing. Besides, the acronym AMARC "does have a nice ring to it." See Dormescar v. U.S. Att'y Gen., 690 F.3d 1258, 1259 n.2 (11th Cir. 2012).

2007). Our order provided that the appeal would "continue unabated" as to Iriele, and so it has.

## I. FACTUAL BACKGROUND

### A. The Pill Mill

Although this case is about Iriele and Ofume's pharmacy, the story starts with AMARC. It was a pain management clinic owned and operated by Godfrey and Bona Ilonzo. The clinic had multiple locations throughout Georgia, but the one at issue here was located in Lakewood, a low-income neighborhood in Atlanta. AMARC operated out of an old house surrounded by a barbed wire fence. It had only two exam rooms and little medical equipment.

Patients and employees described the clinic as small, dirty, rundown, and "sketchy." A witness testified that at one appointment, there were "roaches crawling across the exam table." Another witness testified that the clinic had "[h]oles in the floor, doors that didn't close all the way, bugs, roaches, [and] broken chairs." The sign out front described it as a clinic for "urgent care, family medicine, internal medicine, adults, women, [and] children," but did not mention pain management.

AMARC didn't operate like a normal clinic or medical facility. Instead of allowing patients to schedule appointments, employees would call patients once a month and tell them what day they could come in to see a doctor. When patients

3

arrived, they had to put their names on a sign-in sheet and would be seen on a first-come, first-served basis.  As a result, patients often showed up hours before the clinic opened and waited in line in the parking lot.  One patient said there was a "rat race" to be the first person seen.  Eventually the clinic hired a security guard to see that people waited in their cars instead of congregating in front of the building.

One doctor worked per shift, and he or she would normally arrive around 11:00 a.m. but sometimes much later.  The doctor would see between 40 and 100 patients per day, sometimes causing the clinic to stay open until 10:00 or 11:00 p.m.  Physical exams lasted between five and ten minutes and often included nothing more than a basic vitals check, a quick evaluation of whatever area of the body the patient claimed was hurting, and a urine test for drugs.  After the examination, the doctor would write one or more prescriptions.  At least one AMARC doctor would often write prescriptions for patients without ever examining them at all.

In almost all cases, AMARC would prescribe its patients opioids, Xanax, or Soma (a muscle relaxant).  Usually the clinic would prescribe all three of those drugs to the same patient at the same time.[2]  The doctors often gave patients prescriptions for the specific drugs that they asked for by name.  The clinic did not

---

[2] Soma was not a controlled substance when Iriele committed his crimes, but it is now. We mention it because opioids, Xanax, and Soma, when used in combination, are what one expert witness called the "the unholy holy trinity for substance abuse."

accept insurance, credit cards, debit cards, or money orders for doctor visits; it was cash only. First-time patients paid between $300 and $350 for their visit, while returning patients paid $150. Some long-time patients of the clinic paid only $100 per visit.

Former patients and clinic employees testified that most of AMARC's clientele was made up of drug addicts and drug dealers, many of whom traveled from far away and in groups to visit the clinic. Witnesses recalled seeing patients who were underweight, had track marks on their arms, were missing teeth, had lost their hair, and were otherwise "disheveled" and "shaggy." Witnesses also described how patients showed up "high" and would fall asleep, exchange medications, and shoot up drugs in the bathroom while waiting to see a doctor. One witness described AMARC's patients as "living and talking and wanting and breathing for one thing": pills.

## B. The Compliant Pharmacy

Iriele and Ofume's pharmacy, MCP, was located just a few blocks away from AMARC, an easy walk. Whenever MCP was open either Iriele or Ofume was present. Ofume was the main pharmacist, although others worked there. Iriele had been a licensed pharmacist but was no more. The Georgia Pharmacy

Board had revoked his license in 2007 after he was caught filling forged

prescriptions at a different pharmacy he owned.[3]

There is some evidence that the absence of a license did not always keep

Iriele from filling prescriptions.  Although MCP's former pharmacy technician

testified that Iriele did paperwork and rang up customers instead of filling

prescriptions, two former MCP customers testified that Iriele filled their

prescriptions. Another witness testified that Iriele was "oftentimes" alone in the

pharmacy.

Like AMARC, MCP was small, dirty, and "rundown."  Customers testified

that there were hardly any products on the shelves and that the few that were there

were dusty and out of date.  And like AMARC, MCP was a cash only

establishment — at least when it came to filling prescriptions for controlled

substances.  No insurance accepted, only cash.  According to several former

customers, MCP charged a much higher price for opioids in particular than other

pharmacies did.  Yet, testing the laws of economics, the higher prices apparently

didn't dampen demand for what MCP was offering.

MCP purchased (and hence sold) a lot more opioids than other pharmacies

in the area.  According to a data analyst who testified at trial, MCP was the top

_____

[3] The Georgia Pharmacy Board had also suspended Ofume's pharmacy license for six months after concluding that she was filling forged prescriptions at MCP.

purchaser of oxycodone in its zip code, far outpacing the other pharmacies in that area.  For example, in 2010 MCP purchased 13 times more oxycodone pills (657,900) than a nearby Walgreens (48,600).  In 2011 MCP purchased seven times more oxycodone pills (500,800) than a nearby Kroger pharmacy (69,800).  MCP's volume of opioid purchases also ranked high on a statewide basis.  One witness presented charts showing the ten pharmacies that had purchased the most oxycodone in the State of Georgia for the years 2009 through 2012.  For three of those four years, MCP was among the top ten.  And for one of those years (2010) it reached the pill purchasing pinnacle, buying more oxycodone than any other pharmacy in the State of Georgia.

C.  The Connection Between the Pill Mill and the Compliant Pharmacy

The vast majority of the prescriptions that MCP filled came from AMARC. Between 2009 and 2012, when the authorities shut down AMARC, MCP filled thousands of prescriptions from it.  Those prescriptions accounted for 83% of those that MCP filled and made up more than 90% of the pharmacy's gross sales.  One former customer testified that there was usually a "line of patients" going from AMARC to MCP.

It was no coincidence that most of MCP's prescriptions came from AMARC.  The clinic's doctors and office employees often referred patients to MCP to have their prescriptions filled.  This happened with increasing frequency

7

as other pharmacies in the area began refusing to fill prescriptions written by AMARC's doctors. According to AMARC's patients, clinic employees told them that they could "go right across the street and fill with[ ] no problem." An AMARC doctor testified that one of the clinic's owners had told her "Rosemary [Ofume] will fill all of our prescriptions."

AMARC and MCP were often in contact with each other about their businesses. For example, Ofume would regularly call AMARC to let the doctors know that MCP had run out of a particular drug so that the clinic could prescribe one that the pharmacy had in stock. At one point, an AMARC doctor discovered that a clinic employee was issuing forged prescriptions in the doctor's name. AMARC's owners called Ofume and asked her to help them discourage that doctor from reporting the crime to the police. Ofume not only agreed but went to the clinic to talk with the doctor in person. Another time, the owners of AMARC spoke with Ofume about the possibility of them opening a new clinic in Alabama and her opening a new pharmacy close by.

The owners and employees of both establishments were friendly with each other. The owners of AMARC would come into MCP on occasion to chat with Iriele, Ofume, and pharmacy employees. At least once Ofume was seen in the private area behind AMARC where the clinic's doctors parked their cars. And

8

Ofume had the personal cell phone number of one of the AMARC doctors in her address book.

The owners and employees of the two establishments also did favors for each other. MCP employees who wanted to see a doctor at AMARC did not have to make an appointment or wait in line, and they often did not have to pay for the visit. Likewise, when AMARC employees wanted to get a prescription filled at MCP, the pharmacy often gave them a discount or did not charge them at all. And when AMARC employees wanted to fill a prescription for controlled substances, MCP let them use insurance — something that it refused to allow ordinary customers to do.

The working relationship between AMARC and MCP was plain enough that many of AMARC's patients and MCP's customers assumed the two establishments were connected. A former AMARC patient and MCP customer testified that the word among the patients was that the clinic and pharmacy "were in business together." He said it seemed "like it was a monopoly" because "you've got the doctor setting the price and . . . you've got the pharmacist that the doctor's telling you to go to and they're setting the price at what they want to." Another AMARC patient and MCP customer testified that although she never heard "from the horse's mouth" that the two establishments were connected, it was "hard not to

9

tell" that they were.  Other patients thought that one of AMARC's owners and Ofume were sisters.

## D. The Undercover Visits

The Drug Enforcement Agency eventually caught on to AMARC and MCP and began investigating.  Between late 2010 and early 2011, undercover agent Chris Crutchfield conducted six undercover visits to AMARC and five undercover visits to MCP.  During four of those visits an AMARC doctor prescribed Crutchfield controlled substances and MCP filled the prescriptions.[4]  During two of his visits to MCP, Crutchfield in front of Ofume offered to purchase other customers' controlled substances.  Ofume never said anything to Crutchfield about it, and at one point she laughed about it.  On one of those occasions, three other customers took Crutchfield up on his offers to purchase controlled substances from them.  Crutchfield recalled seeing Iriele during only one of his trips to MCP, but he could not remember which trip it was.

In August 2012, the authorities shut down AMARC and MCP. By that time, though, MCP was already having difficulty getting drug distributors to sell it controlled substances.

---

[4] Crutchfield was unable to see a doctor at AMARC during his first visit there, but an agent accompanying him did see a doctor who gave the agent a prescription.  Both agents then went to MCP together, and it filled the prescription.

## II.  PROCEDURAL HISTORY

In September 2013, a grand jury named Iriele and several other defendants in a 28-count indictment.[5]  He was charged in 10 of those counts.  Count 1 charged Iriele with conspiring to distribute and dispense controlled substances in violation of 21 U.S.C. § 846.  Counts 2 through 4 charged him with distributing and dispensing, and aiding and abetting the distribution and dispensing of, controlled substances in violation of 21 U.S.C. § 841(a)(1).  Count 23 charged him with conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h).  Counts 24 through 26 charged him with committing "financial transaction" money laundering in violation of 18 U.S.C. § 1957.  And Counts 27 and 28 charged him with committing "concealment" money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

Iriele pleaded not guilty and went to trial.  Over the course of three weeks the government presented 25 witnesses, including four experts, and the defense presented two witnesses, including one expert.  Iriele did not testify.  The jury found him guilty of all ten counts.  The district court entered a judgment of conviction and sentenced him to 240 months in prison "as to each of Counts 1–4,

---

[5] There had been two earlier versions of the indictment, but they had named only defendants who worked for AMARC.  Iriele was not named until the second superseding indictment, which was issued on September 5, 2013.  For simplicity's sake, we will refer to the second superseding indictment as "the indictment" throughout this opinion.

23, 27 and 28," and 120 months in prison "as to Counts 24–26," with "all terms to be served concurrently."

By our tally, Iriele raises 15 different issues on appeal.  We have carefully considered all of those issues.  Some merit discussion.  Most don't.  We will limit our discussion to the following issues: (1) whether the district court erred by allowing a federal agent to testify that a certain document was written in Iriele's handwriting; (2) whether the evidence was sufficient to convict Iriele of the charges against him; (3) whether the district court plainly erred when it instructed the jury on the standard to convict under § 841(a)(1); and (4) whether the district court plainly erred by failing to instruct the jury on several money laundering charges.[6]

---

[6] In addition to those four issues, Iriele also contends that the district court: (1) abused its discretion by admitting videos and testimony that contained hearsay statements; (2) abused its discretion by admitting evidence of Iriele's prior convictions and license revocation under Fed. R. Evid. 404(b); (3) abused its discretion by excluding evidence of a government witness's supposed misconduct during an earlier investigation; (4) abused its discretion by admitting evidence of an AMARC customer's non-fatal overdoses without any proof that the customer overdosed on prescriptions filled at MCP; (5) abused its discretion by admitting state and federal law as substantive evidence; (6) abused its discretion by admitting testimony from an expert witness that was outside the scope of his expertise; (7) erred by admitting a handwritten document into evidence without enough known samples of Iriele's handwriting for the jury to compare with the handwriting in the disputed document; (8) erred by instructing the jury on a means of violating 18 U.S.C. § 1956 that was not alleged in the indictment; (9) plainly erred by failing to instruct the jury that it was ultimately up to the jury to decide whether Iriele had authored a certain handwritten document; (10) erred by instructing the jury that good faith was irrelevant to Counts 2 through 4; and (11) plainly erred in instructing the jury on 21 U.S.C. § 846.

We will not discuss why those scattershot contentions lack merit.  Cf. Dominguez v. Tom James Co., 113 F.3d 1188, 1190 (11th Cir. 1997) ("None of the [appellant's] other issues that we have listed above merit[s] any further discussion.").  But we remind counsel that raising a plethora of issues is not good advocacy.  Rogers v. Zant, 13 F.3d 384, 388 (11th Cir. 1994)

## III.  HANDWRITING TESTIMONY

During a search of Iriele's home, investigators seized a handwritten ledger detailing certain transactions that Iriele used to launder MCP's money.  The ledger was relevant to Counts 27 and 28, the concealment money laundering charges.  Its admissibility and significance depended in part on whether Iriele had authored it.  Over Iriele's objection, the district court allowed a law enforcement agent who had investigated Iriele's money laundering schemes to give an opinion to the jury about whether the handwriting in the ledger was Iriele's.  His opinion was that it was.

Iriele contends that under Federal Rule of Evidence 901(b)(2) the district court should not have allowed the agent to testify that Iriele had written the ledger.  That rule provides that a nonexpert can testify "that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation."  Fed. R. Evid. 901(b)(2).  Iriele argues that the agent's opinion about the handwriting in the ledger was barred by Rule 901(b)(2) because the agent became familiar with Iriele's handwriting only while investigating this case.  Our review is only for abuse of discretion.  United States v. Frank, 599 F.3d 1221, 1239 (11th Cir. 2010).

The assumption tucked into Iriele's argument is that when an investigator becomes familiar with a defendant's handwriting in the course of investigating a

---

("[A]s the Supreme Court has stressed, we know good advocacy requires the winnowing out of some arguments in favor of stressing others: multiplicity of arguments or defenses hints at the lack of confidence in any one.").

13

crime, Rule 901(b)(2) categorically bars him from identifying that handwriting in any resulting prosecution because his familiarity was "acquired for the current litigation." We have never held that. Several of our sister circuits have addressed this issue and all of them have held that an investigator can identify a defendant's handwriting after becoming familiar with it during a criminal investigation. See United States v. Harris, 786 F.3d 443, 447–48 (6th Cir. 2015); United States v. Ali, 616 F.3d 745, 753–54 (8th Cir. 2010); United States v. Samet, 466 F.3d 251, 256 (2d Cir. 2006); United States v. Scott, 270 F.3d 30, 48–50 (1st Cir. 2001). Each of those circuits has drawn a distinction, either explicitly or implicitly, between becoming familiar with someone's handwriting "for the current litigation" and doing so for the purpose of determining if the defendant has committed a crime. See Harris, 786 F.3d at 448 (expressly drawing that distinction); Samet, 466 F.3d at 256 (same); Scott, 270 F.3d at 50 (same); see also Ali, 616 F.3d at 754 ("During the investigation Agent Tarr gained familiarity with [the defendant's] bank signature card and fingerprint card, which . . . was sufficient to authenticate the exhibits [under Rule 901(b)(2)]."). We agree with those four decisions of our sister circuits.

A lay witness becomes familiar with someone's handwriting "for the current litigation" when he does so solely for the purpose of identifying it at trial. Rule 901(b)(2) bars such a witness from identifying the handwriting because if he did,

14

he would be intruding in an area that is "reserved to the expert [witness]." Fed. R. Evid. 901(b)(2) advisory committee's note to 1972 proposed rules. As the Second Circuit has observed: "While a lay witness may not enter court, see for the first time two samples of handwriting, and identify the contested sample as written by the same person as the previously authenticated sample, that is precisely what an expert is charged with doing." Samet, 466 F.3d at 255–56 (cleaned up). The same thing is true "if the witness compared the two samples [for that purpose] before entering the courtroom." Scott, 270 F.3d at 50; see, e.g., United States v. Pitts, 569 F.2d 343, 348 (5th Cir. 1978) (affirming the district court's exclusion of opinion testimony by a lay witness who made a "one-shot comparison" between handwriting samples in preparation for an upcoming trial).[7] But a lay witness who became familiar with the defendant's handwriting for some purpose other than identifying it at trial does not usurp the role of the expert witness, even if he later offers an opinion about the handwriting at trial. See Samet, 466 F.3d at 255–56.

---

[7] The Pitts decision, which is binding precedent, see Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), noted that the lay witness in question "acquired any [handwriting] expertise he arguably had for purposes of a pending criminal investigation." 569 F.2d at 348. That was one of the reasons why the Court held that the witness's handwriting opinion testimony was properly excluded under Rule 901(b)(2). See id. At first glance, Pitts might seem to stand for the proposition that a witness who learns someone's handwriting "for purposes of a pending criminal investigation" can't offer an opinion about that handwriting under Rule 901(b)(2). But the lay witness in Pitts was not an investigator trying to solve a crime; he was a lawyer who was preparing to defend his client at an upcoming criminal trial. See id. at 348 & n.9. That means the lay witness in Pitts — unlike the lay witness here — became familiar with the handwriting at issue for the purpose of using that knowledge at trial.

An investigator who becomes familiar with the defendant's handwriting for the purpose of solving a crime is different from a lay witness who makes a handwriting comparison so he can testify about it at trial.  That investigator is in the same position as any other lay witness who, as part of his job or in his day-to-day affairs, has seen examples of the defendant's handwriting, such as the defendant's "accountant, employee[,] or family member."  Id. at 256.  His opinion about the defendant's handwriting is not categorically barred by Rule 901(b)(2).[8]

This interpretation of Rule 901(b)(2) is supported by its context.  We have read Rule 901(b)(2) in tandem with Federal Rule of Evidence 701, which governs opinion testimony by lay witnesses, because "testimony purporting to satisfy the specific requirements of Rule 901(b)(2) must also satisfy the general requirements in Rule 701."  Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1259 (11th Cir. 2004).  Rule 701(b) provides that lay opinion testimony is not admissible unless it would be helpful to the jury.  Our holding about the meaning of Rule 901(b)(2)

---

[8] We say "categorically" because Rule 901(b)(2) imposes more than one restriction on lay opinion testimony about handwriting.  We have held that Rule 901(b)(2), when read together with Federal Rule of Evidence 701, requires a witness to establish "with particularity" how he became familiar with the handwriting in question and what relationship he has with the handwriting's author before he can give an opinion about it.  See Hall v. United Ins. Co. of Am., 367 F.3d 1255, 1259–61 (11th Cir. 2004).  An investigator's lay opinion about handwriting will be barred by Rule 901(b)(2) and Rule 701 if he fails to lay the necessary foundation.  See id. Iriele does not argue that the agent who testified about his handwriting at trial failed to lay the necessary foundation.  Instead his argument is that the agent's testimony should have been excluded categorically under Rule 901(b)(2) because the agent became familiar with his handwriting during a criminal investigation.  We disagree.

16

excludes lay opinion testimony that would be unhelpful to the jury. A nonexpert witness who becomes familiar with the defendant's handwriting for the purpose of identifying it at trial does not assist the jury because "such a comparison could be made as easily by the jury as by the witness." Scott, 270 F.3d at 50; see also Samet, 466 F.3d at 255 ("A lay witness who lacks prior familiarity with a person's handwriting and forms an opinion on it for the first time in preparation for testimony as a witness does not offer helpful testimony."). But a lay witness who is exposed to the defendant's handwriting many times during a months- or years-long investigation does help the jury because he possesses "the extent of familiarity contemplated by [Rule] 901(b)(2)," Pitts, 569 F.2d at 348, which the jury is unlikely to have gained during the course of the trial.

For those reasons, the district court did not err by allowing the agent who had become familiar with Iriele's handwriting during his investigation to offer his opinion that the handwriting in the ledger was Iriele's.

## IV. SUFFICIENCY OF THE EVIDENCE

"When a defendant preserves a challenge to the sufficiency of the government's evidence by moving for a judgment of acquittal, we review the sufficiency of the evidence de novo." United States v. Watts, 896 F.3d 1245, 1250 (11th Cir. 2018). In doing so, we "view[] the evidence in the light most favorable to the verdict and draw[] all reasonable inferences and credibility choices in the

17

verdict's favor." United States v. Godwin, 765 F.3d 1306, 1319 (11th Cir. 2014) (quotation marks omitted). A guilty verdict "cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Rodriguez, 732 F.3d 1299, 1303 (11th Cir. 2013). "Because a jury is free to choose among the reasonable constructions of the evidence, it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." Godwin, 765 F.3d at 1320 (quotation marks omitted).[9]

Iriele challenges the sufficiency of the evidence for his drug offense convictions and his money laundering convictions. We will address his challenges in that order.

## A.  Drug Conspiracy Conviction

Count 1 of the indictment charged Iriele with violating 21 U.S.C. § 846 by conspiring with the owners of AMARC, two of AMARC's doctors who were

---

[9] The government argues that Iriele did not renew his motion for judgment of acquittal after the close of all evidence and that as a result, we should review only for a "manifest miscarriage of justice." It is true that Iriele initially forgot to renew his motion. But as soon as trial began the next day, his lawyer stated: "One thing, Judge. I forgot at the close of the evidence to renew our Rule 29. I'll just do that. I don't have any additional argument." The court said: "All right. I note your motion[], and I will maintain the previous ruling[]." Because the district court accepted Iriele's late renewal and the government did not object to the court doing so, we will also consider the motion as though it had been timely renewed and apply the usual de novo standard of review.

named, and Ofume to distribute and dispense controlled substances (oxycodone, oxycodone with acetaminophen, methadone, hydromorphone, hydrocodone with acetaminophen, alprazolam, and carisoprodol) in violation of 21 U.S.C. § 841(a)(1). To convict a defendant of that crime, the government must prove three things: (1) there was an agreement between two or more people to unlawfully distribute and dispense controlled substances in violation of § 841(a)(1); (2) the defendant knew about the agreement; and (3) the defendant "voluntarily joined" the agreement. United States v. Azmat, 805 F.3d 1018, 1035 (11th Cir. 2015).

We begin with an explanation of how § 841(a)(1) applies to physicians and pharmacists. Or rather, how it does not apply to them if they are legitimately dispensing controlled substances. An exception allows physicians to issue prescriptions for controlled substances and allows pharmacists to fill them. See 21 U.S.C. § 829. Regulations specify when the exception applies and when it doesn't. Those regulations provide that the prescription must be "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). They also provide that "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Id. If a prescription isn't issued for a legitimate medical purpose in the usual course of a practitioner's

19

practice, "the person knowingly filling such a purported prescription, as well as the person issuing it," violates § 841(a)(1).  Id.  Reading all of the relevant provisions together, we have explained the basic framework this way:

> To convict a licensed physician under section 841(a)(1), it is incumbent upon the government to prove that he dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally. And to convict a licensed pharmacist under section 841(a)(1), the government must prove that the pharmacist filled a prescription knowing that a physician issued the prescription without a legitimate medical purpose or outside the usual course of professional practice.

United States v. Joseph, 709 F.3d 1082, 1094 (11th Cir. 2013) (cleaned up).

With that framework in mind, we turn back to the elements of § 846.  Iriele concedes that the first element (whether an agreement existed) is met in this case because the AMARC defendants did agree to issue prescriptions without a legitimate medical purpose and outside the usual course of professional practice. But he contests the other two elements, contending that the evidence was insufficient to show that he personally knew about the agreement among the AMARC defendants themselves or that he voluntarily joined that agreement.

### 1.  The Knowledge Element

Iriele contends that there was insufficient evidence to prove he knew that AMARC doctors and employees had agreed to run the clinic in a way that unlawfully distributed or dispensed drugs.  He argues that no direct evidence was presented that he knew of their agreement.  He's right.  The government presented

20

no evidence that Iriele ever had any discussions with the AMARC defendants, or ever overheard any discussions among them, about their agreement to operate a pill mill.  But the lack of direct evidence does not end the inquiry.

The government can prove a § 846 conspiracy with circumstantial evidence, and when it comes to knowledge of a conspiracy we have said that the government does enough when it shows that "the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him."  Azmat, 805 F.3d at 1035 (quotation marks omitted); see also United States v. Tamargo, 672 F.2d 887, 889 (11th Cir. 1982) ("Proof is not required that the defendant had knowledge of all the details of the conspiracy; the defendant need only have knowledge of the essential objective of the conspiracy.").  If the evidence shows that it would have been obvious to Iriele that the AMARC defendants had agreed among themselves to issue prescriptions without a legitimate medical purpose or outside the usual course of professional practice, Iriele loses this argument.

Because Iriele did not work at AMARC and nothing at trial indicated that he was ever present inside the AMARC office, we look to whether the things he saw and heard at MCP and by virtue of his position there would have made it obvious to Iriele that AMARC was an illegal pill mill being operated by the other defendants.  They would have.

21

To start with, Iriele was well aware of the kinds of prescriptions that AMARC was issuing. He was because he was the co-operator of MCP, he was at the pharmacy much of the time, he handled the pharmacy's paperwork, he helped to ring up the prescriptions, and he had full access to the computer that the pharmacists used to process prescriptions. He had to know, and the jury could have found that he did know, the vast majority of the prescriptions that MCP filled came from AMARC. As a result, Iriele had to know that AMARC's doctors were issuing an enormous number of prescriptions for large quantities of opioids, Xanax, and Soma, often in combination for a patient.

It would have been obvious to a trained pharmacist like Iriele that those prescriptions were illegitimate. One red flag was the sheer volume of opioids that AMARC prescribed. MCP had to order hundreds of thousands of doses of opioids each year to keep up with demand from AMARC patients — far more than any other pharmacy in the area — and for one year more than any other pharmacy in the state. See United States v. Hammond, 781 F.2d 1536, 1538 (11th Cir. 1986) (affirming pharmacist's conviction where the evidence showed that the "outrageous volume" of controlled substances prescribed by a pill mill "would have alerted any pharmacist that prescriptions were being improperly issued," but the pharmacist filled those prescriptions anyway).

22

Another red flag was the drug combinations that AMARC prescribed. Two of the government's experts testified that oxycodone, Xanax, and Soma are commonly abused together, and one of those experts added that those three drugs have been "described in the pharmacy and medical literature as the unholy holy trinity for substance abuse." The same expert explained that there is no legitimate reason for a single patient to be using those three drugs together for more than a short period of time.

In addition to that, Iriele saw the customers who were coming into MCP to fill all those AMARC prescriptions. It would have been obvious to anyone that many of those customers were seeking and obtaining drugs for something other than a legitimate medical purpose. For one thing, the customers unmistakably exhibited signs of being drug addicts. Witnesses at trial testified that AMARC's patients were underweight, had track marks on their arms, were missing teeth or losing hair, and were "disheveled," "unkempt," and "living and talking and wanting and breathing" for pills. MCP's pharmacy technician testified that customers would sometimes come in "not looking right, passing out, [or] falling asleep."

Another fact that had to have been apparent to Iriele is that most of AMARC's patients were between 20 and 50 years old. The government's medical expert testified that was "pretty unusual" because patients who experience the type

23

of chronic pain that warrants the use of controlled substances are typically between 40 and 80 years old.

Iriele also would have noticed as he was ringing up customers that many of them were from out of state.  The record indicates that MCP, like other pharmacies in the area, required customers to provide their driver's licenses before they could have their prescriptions filled.  That means Iriele would have known where AMARC's patients were coming from.[10]  According to the government's medical expert, the fact that a patient comes a long way for what should be a straightforward medical appointment is a red flag that the patient may be a habitual drug abuser looking for controlled substances.

Based on all the red flags involving the quantity and nature of AMARC's prescriptions as well as the characteristics of AMARC's patients, other pharmacists in the area had concluded that AMARC was operating a pill mill and started turning the clinic's patients away.

---

[10] MCP's pharmacy technician testified that MCP "didn't take out-of-state doctors or people who lived out of state."  But MCP's own records show that between 2009 and 2012 it dispensed thousands of prescriptions to customers who reported out-of-state addresses.  A reasonable jury could have credited MCP's internal records over the testimony of MCP's pharmacy technician.  See United States v. Godwin, 765 F.3d 1306, 1319 (11th Cir. 2014) (stating that when we review the sufficiency of the evidence, we "draw[] all reasonable inferences and credibility choices in the verdict's favor") (quotation marks omitted).  And even if Iriele didn't personally ring up all of those thousands of prescriptions, a reasonable jury could have found that he likely would have seen the customers' out-of-state addresses when he did the pharmacy's paperwork.

For example, Jignesh Patel testified that he had refused to fill AMARC's prescriptions for four or five customers at his pharmacy. He did so because he had noticed that the customers were poorly dressed, looked "shaggy," and smelled bad. The customers did not seem to have any serious medical conditions that would justify their prescriptions for large quantities of oxycodone, Soma, and Xanax. One of the customers showed him an out of state driver's license, which was another warning sign for him. And he thought the prescriptions themselves were suspect: he believed that a legitimate doctor would not write a prescription for a large quantity of Xanax combined with pain medication.

Another pharmacist, Clementine Nanje, testified that she had a list of clinics and doctors whose prescriptions her pharmacy would refuse to fill and that AMARC and its doctors were on that list.

And pharmacist Jennifer Brandee Hinson testified that her standard practice was to refuse to fill AMARC's prescriptions because the clinic's patients were from out of state (as reflected on their driver's licenses) and had prescriptions for large quantities of controlled substances. At one point she even emailed the Georgia Drugs and Narcotics Agency to let officials know about AMARC's suspicious prescriptions.

Those were not the only pharmacists who refused to fill AMARC's prescriptions for controlled substances. At trial, AMARC's patients and

25

employees testified that other pharmacies throughout the state were turning away AMARC's controlled substance prescriptions.

Given that mountain of evidence, a jury could reasonably have concluded that Iriele, like all those other pharmacists, knew that AMARC's owners and doctors were running a pill mill, working together to prescribe controlled substances without a legitimate medical purpose and outside the usual course of professional practice. See Azmat, 805 F.3d at 1035–37 (holding that the evidence was sufficient to show that a physician knowingly and voluntarily joined an agreement to unlawfully dispense controlled substances in part because "there was an abundance of red flags that should have tipped off any doctor that his patients were seeking pills"); Joseph, 709 F.3d at 1104 ("Conduct that suggests that a defendant distributed a prescription without a legitimate medical purpose and outside the usual course of professional practice includes conduct where an inordinately large quantity of controlled substances was prescribed [and] large numbers of prescriptions were issued.") (cleaned up). As a result, Iriele's argument that the evidence was insufficient to show that he knew that the AMARC defendants were knowingly working in concert with each other fails.

### 2. The Participation Element

Iriele also contends that there was insufficient evidence to prove the participation element of his § 846 conviction. He argues that the evidence was

insufficient to prove that he voluntarily participated in the AMARC defendants' agreement. Like knowledge, participation can be proved with circumstantial evidence. See United States v. Russo, 717 F.2d 545, 549 (11th Cir. 1983). And one way to prove through circumstantial evidence that a defendant joined a conspiracy is by showing that he committed acts that furthered the purpose of the conspiracy. United States v. Frink, 912 F.2d 1413, 1416 (11th Cir. 1990). The government presented more than enough evidence to show that Iriele did that.

It does no good for a pill mill to grind out truckloads of prescriptions if no pharmacy will fill them. In order for the AMARC conspiracy to operate successfully, it needed a pharmacy to fill the prescriptions it issued. That's what MCP did, and that's how Iriele participated in the effort, in the conspiracy.

One of AMARC's employees testified that MCP was "where most of the patients went and had their prescriptions filled." A government data analyst prepared a summary showing that MCP filled more of AMARC's prescriptions than any other pharmacy. MCP filled so many of AMARC's prescriptions that AMARC's patients became its primary source of business. Between 2009 and 2012 AMARC's prescriptions accounted for more than 83% of MCP's dispensing and over 90% of the pharmacy's gross sales. That is participating big time in what AMARC was doing.

As time went on, MCP's continued willingness to fill AMARC's prescriptions became more critical to the AMARC defendants' ability to illegally distribute controlled substances. As we have already discussed, other pharmacists realized that AMARC was running a pill mill and started turning its patients away. See Part IV.A.1, supra. But MCP and Iriele did not turn AMARC's patients away. In fact, the owners of AMARC were so sure that MCP would keep participating in making the pill mill operation work that they told the clinic's doctors and employees to send any patients who were turned away by other pharmacies to MCP. And that's exactly what AMARC's doctors and employees did until the Drug Enforcement Agency shut down the clinic.

The arrangement between AMARC and MCP worked so well that patients saw the two businesses as "related," "connected," or a "monopoly." And one owner of AMARC even approached Ofume about the possibility of him opening up a new clinic in Alabama and MCP opening up a pharmacy nearby.

Just as MCP was a crucial part of AMARC's operation, Iriele was a crucial part of MCP's operation. Either he or Ofume was at the pharmacy at all times. Iriele would often ring up customers, and he told them about MCP's prices (which were unusually high) and the fact that MCP would accept only cash for controlled substance prescriptions. He was responsible for the pharmacy's paperwork. He and Ofume counted the pharmacy's cash at the end of the day, and he was an

28

authorized signer on MCP's bank accounts. Two of AMARC's patients testified that Iriele himself filled their prescriptions, even though his pharmacy license had been revoked.

On those facts, a reasonable jury could have concluded that Iriele voluntarily joined the conspiracy with AMARC's doctors and owners to illegally dispense controlled substances. See Hammond, 781 F.2d at 1538 (concluding that the evidence was sufficient to show that a pharmacist participated in and furthered a physician's scheme in part because (1) "the great bulk of prescriptions issued" by that physician were filled by the pharmacist, and (2) the pharmacist "began functioning as a virtual wholesaler of the controlled drug" that the physician was issuing, with the pharmacy purchasing over 80% of the manufacturer's stock for that sales territory).

### B. Dispensing and Distribution Conviction

Iriele also contends there was insufficient evidence to convict him of Counts 2 through 4 of the indictment, which charged him with violating § 841(a)(1) by distributing and dispensing, and aiding and abetting the distribution and dispensing of, controlled substances. Those charges were based on three occasions when MCP filled undercover agent Chris Crutchfield's AMARC prescriptions for Roxicodone. Iriele contends that the government failed to prove that he: (1) knew that the prescriptions were issued without a legitimate medical purpose or outside

29

the course of professional practice, and (2) filled the prescriptions or willfully aided and abetted MCP pharmacists in filling the prescriptions.

But, as we have already discussed, the evidence was sufficient to show that Iriele knew AMARC was prescribing controlled substances without a legitimate medical purpose and outside the usual course of professional practice. See Part IV.A.1, supra. And under our precedent the government was not required to show that Iriele was the one who actually filled the prescriptions or that he personally helped another pharmacist fill them. The fact Iriele knew AMARC was issuing illegitimate prescriptions and allowed the pharmacists that he employed to fill thousands of those prescriptions, including the three involved here, was evidence enough. See Hammond, 781 F.2d at 1538–39 (rejecting pharmacist's nearly identical argument).

## C. Money Laundering Conspiracy Conviction

Count 23 charged Iriele with violating § 1956(h) by conspiring with Ofume to commit promotional, financial transaction, concealment, and structuring money laundering. Promotional money laundering is the use of illegally-obtained money to fund more illegal activity. See 18 U.S.C. § 1956(a)(1)(A)(i). Financial transaction money laundering is the use of a financial institution to conduct a monetary transaction involving more than $10,000 of illegally obtained funds. See id. § 1957. Concealment money laundering is any transaction designed to conceal

30

or disguise the true nature or location of illegally obtained funds.  See id. § 1956(a)(1)(B)(i).  And structuring money laundering is the use of illegally obtained funds to carry out a financial transaction that is designed to avoid a state or federal reporting requirement.  See id. § 1956(a)(1)(B)(ii).

To convict a defendant of conspiracy to commit money laundering, the government must prove "(1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant."  United States v. Feldman, 936 F.3d 1288, 1307 (11th Cir. 2019) (quotation marks omitted).  The government can do that by using "circumstantial evidence, including inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme."  Azmat, 805 F.3d at 1037 (quotation marks omitted).

And when the indictment lists more than one object of the conspiracy, as it did here, the evidence "need only be sufficient for any one of the charged objects to sustain a conviction."  United States v. Moran, 778 F.3d 942, 963 (11th Cir. 2015).  That means so long as the jury could reasonably have concluded that Iriele and Ofume made an agreement to commit promotional money laundering, concealment money laundering, financial transaction money laundering, or structuring money laundering, the evidence was sufficient to convict.  See Feldman, 936 F.3d at 1307–08.

31

The jury could reasonably have concluded that Iriele and Ofume made an agreement to commit promotional money laundering and that Iriele knowingly and voluntarily participated in that agreement. Again, that type of money laundering occurs when a person uses funds from an unlawful activity to promote carrying out more unlawful activity. Azmat, 805 F.3d at 1037.

The evidence proved that both Iriele and Ofume knew the money MCP earned from filling AMARC's prescriptions was criminally derived. We have already explained, while discussing the drug conspiracy conviction, how the evidence showed that Iriele knew MCP was unlawfully filling prescriptions. See Part IV.A.1, supra. The same evidence shows that Iriele knew the money MCP earned was criminally derived. See Feldman, 936 F.3d at 1307 ("[B]ased on our conclusion that sufficient evidence supported the drug conspiracy conviction, it necessarily follows that the [defendants] knew that the transactions involved the proceeds of unlawful activity."). The evidence proves Ofume's knowledge too. And we can add to that evidence the fact that Ofume had visited AMARC on multiple occasions and had a relationship with AMARC's owners and doctors.[11]

---

[11] In addition to the challenge that relates only to his money laundering conspiracy conviction, Iriele challenges all of his money laundering convictions — Counts 23 through 28 — on the ground that the government failed to prove that he knew MCP's money was criminally derived. That challenge fails for the reasons we have just discussed.

32

The evidence shows that MCP made most of its money by filling AMARC's prescriptions. As we have already discussed, MCP's pharmacy technician testified that 80% to 85% of MCP's customers obtained their prescriptions from AMARC, and a government data analyst testified that AMARC's prescriptions accounted for 90% of the pharmacy's gross sales. See Part IV.A.2, supra. Iriele and Ofume managed that money together. Both counted MCP's cash at the end of the day, both made deposits into the MCP bank account, and both were authorized signers on the MCP bank account.

Finally, much of that money was used to purchase more controlled substances to dispense. Ofume issued checks from the jointly controlled MCP bank account to purchase controlled substances for the pharmacy from drug distributors. Between 2009 and 2012, MCP paid over $3 million from its bank account to 32 different drug distributors to purchase drugs to distribute.

For those reasons, the evidence was sufficient for a jury to conclude that Iriele conspired with Ofume to commit promotional money laundering.

## V. JURY INSTRUCTIONS

Iriele contends that the district court made various errors in its jury instructions. Not all of his jury instruction challenges merit discussion, but two of them do: his contentions that the district court erred in its instructions to the jury on

33

the standard to convict a pharmacist under § 841(a)(1), and that it erred by failing

to separately instruct the jury on § 1956(h) and § 1957.

### A.  The Instructions and Iriele's Arguments

Before we can assess Iriele's arguments, we need to describe his challenges

to the jury instructions and the arguments behind those challenges.

Counts 2, 3, and 4 of the indictment charged Iriele with three separate

violations of 21 U.S.C. § 841(a)(1).  The court instructed the jury, in relevant part:

> Counts 2, 3, [and] 4 charge that Defendants knowingly and intentionally distributed controlled substances outside the course of professional medical practice and for other than a legitimate medical purpose.
>
> . . . .
>
> Title 21 United States Code Section 841(a)(1) makes it a crime for anyone to knowingly or intentionally . . . distribute or dispense a controlled substance, except as authorized by federal law.  Because many controlled substances have an accepted medical use, federal law authorizes registered practitioners [including pharmacists] to distribute and dispense controlled substances for legitimate medical purposes within the usual course of professional practice.
>
> . . . .
>
> . . . [A] pharmacist has violated Section 841(a)(1) when the Government has proved beyond a reasonable doubt that the pharmacist['s] actions were not for legitimate medical purposes or were outside the usual course of professional practice.
>
> . . . .
>
> The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

34

> . . . .

> > (2) the Defendant intended to distribute and dispense these substances outside the course of professional practice or without a legitimate medical purpose.

> . . . .

> > A pharmacist may be convicted of a violation of Title 21, United States Code, Section 841(a)(1) when s/he dispenses a controlled substance either outside the usual course of professional practice or without a legitimate medical purpose.

As that excerpt shows, the district court consistently instructed the jury that a pharmacist violates § 841(a)(1) when he dispenses a controlled substance outside the usual course of professional practice or without a legitimate medical purpose.

Iriele argues that those instructions were plainly erroneous because, under our binding precedent, "[t]he jury should have been, but never was, instructed that to convict Mr. Iriele under § 841(a)(1), it had to find that he filled a prescription _knowing_ that a physician issued the prescription without a legitimate medical purpose or outside the usual course of professional practice."  Appellant's Br. at 44–45.  He argues that the error affected his substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings because it allowed the jury to convict him "without finding that he had any criminal intent." Appellant's Br. at 46–47.

Count 23 of the indictment charged Iriele with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  The court instructed the jury:

35

Count 23 charges that Defendants knowingly conspired to conduct financial transactions affecting interstate commerce which involved the proceeds of the illegal distributing and dispensing of controlled substances outside the course of professional practice and for other than a legitimate medical purpose, to conceal and disguise the nature and source, ownership, and control of the proceeds of this unlawful activity, and to avoid a transaction reporting requirement under Federal law. Count 23 also charges that Defendants knowingly conspired to engage in monetary transactions, by, through, or to a financial institution, affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00.

. . . .

But first note that the Defendants are not charged in Counts 1 and 23 with committing a substantive offense – they are charged with <u>conspiring</u> to commit that offense.

The court also instructed the jury on the elements of promotional, concealment, and structuring money laundering. And within its instructions on those offenses the court defined a number of terms, including "financial institution" and "proceeds." The court did not, however, specifically instruct the jury on the elements of conspiracy to commit money laundering.

Counts 24, 25, and 26 of the indictment charged Iriele with financial transaction money laundering in violation of 18 U.S.C. § 1957. The court instructed the jury:

Counts 24, 25, [and] 26 charge that Defendant Donatus Iriele knowingly engaged in a monetary transaction affecting interstate commerce and foreign commerce in criminally derived property that was of a value greater than $10,000.00.

36

But the court did not specifically instruct the jury on the elements of financial transaction money laundering.

Iriele's argument about Counts 23 through 26 is simple. He says that "the district court erred by entirely failing to instruct the jury on Counts 23–26." Appellant's Br. at 40. That error "is plainly harmful," he argues, because "the jury had no guidance in convicting Mr. Iriele of these counts." Id. He adds that "[i]f this Court determines that the issue will be reviewed only for plain error, . . . it was plainly erroneous for the district court to fail to instruct the jury on these counts at all." Id. at 40 n.14.

### B. The Standard of Review

#### 1. The Failure to Object

If Iriele did not object and preserve those grounds at trial, we review only for plain error. He concedes that he did not preserve the § 841(a)(1) error involving Counts 2, 3, and 4. But he argues that he did preserve the § 1956(h) and § 1957 errors and is entitled to de novo review of those issues. In the proposed jury instructions he submitted before trial, Iriele requested (among other things) separate instructions on § 1956(h) and § 1957. As he sees it, that request is enough to preserve the issues even though he did not object when separate instructions were not given. He is mistaken about that.

Federal Rule of Criminal Procedure 30(d) provides that "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). The objection must be specific enough "to give the district court the chance to correct errors before the case goes to the jury." United States v. Sirang, 70 F.3d 588, 594 (11th Cir. 1995). "Without such an objection, we review only for plain error." Id.; accord Fed. R. Crim. P. 30(d) ("Failure to object in accordance with this rule precludes appellate review, except as permitted under [Fed. R. Crim. P.] 52(b) [governing plain error review]."); see, e.g., United States v. Pepe, 747 F.2d 632, 675 (11th Cir. 1984) ("The issue appellants raise was never preserved, however, by proper objection pursuant to Fed. R. Crim. P. 30 . . . [so] our review of this issue is limited to correcting plain error.").

Before deliberations began, Iriele had an opportunity to object to the district court's jury instructions in the periods before and after they were given. He could have objected then as he did to some of the other instructions. He did not, however, object then, or at any time, to the court's failure to give the jury separate instructions on § 1956(h) and § 1957. As a result, Iriele did not give the district court a chance to correct the error he belatedly complains about. See Sirang, 70 F.3d at 594. For that reason, we are limited to plain error review of it.

38

## 2.  The Plain Error Standard

To prevail under plain error review, Iriele must show that the district court made an error, that the error was plain, and that it affected his substantial rights. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005).  If he carries that burden, we have discretion to reverse — but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.  Id.

Satisfying the substantial rights prong of plain error review "is anything but easy."  Id. at 1299.  To do it, the defendant generally must show a "reasonable probability" that the error affected the outcome of the district court proceedings, "which means a probability sufficient to undermine confidence in the outcome." Id. (quotation marks omitted).  The Supreme Court has instructed us that to show an error has affected a defendant's substantial rights for plain error purposes, "in most cases . . . the error must have been prejudicial: It must have affected the outcome of the district court proceedings."  United States v. Olano, 507 U.S. 725, 734 (1993).

The substantial rights analysis is like harmless error review but with a twist: the defendant, not the government, "bears the burden of persuasion with respect to prejudice."  See United States v. Monroe, 353 F.3d 1346, 1352 (11th Cir. 2003).  A tie goes to the government.  "[I]f it is equally plausible that the error worked in favor of the defense, the defendant loses; if the effect of the error is uncertain so

39

that we do not know which, if either, side it helped the defendant loses." Rodriguez, 398 F.3d at 1300. Uncertainty works against reversal. See id. (explaining that in plain error review, "the burden truly is on the defendant to show that the error actually did make a difference.").

To merit reversal, a plain error must not only affect the defendant's substantial rights, but must also seriously affect the fairness, integrity, or public reputation of judicial proceedings. Olano, 507 U.S. at 736. An error does not meet that prong merely because it affected the outcome of the trial. Something more is required, because "otherwise the discretion afforded by [plain error review] would be illusory." Id. at 737. A defendant does not have to prove his innocence to use the plain error rule, id. at 736–37, but the Supreme Court has reminded lower courts that: "Appellate review under the plain-error doctrine, of course, is circumscribed and we exercise our power under Rule 52(b) sparingly." Jones v. United States, 527 U.S. 373, 389 (1999).

### 3. Applying Plain Error Review to Jury Instructions

How sparingly should the power to correct an instruction error for which there was no objection be exercised? The Supreme Court's answer to that question is straightforward: "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Jones, 527 U.S. at 389 (quotation marks omitted).

40

When we apply the plain error rule to jury instructions, we do not consider the asserted errors in isolation. Instead we "consider 'the totality of the charge as a whole' and determine 'whether the potential harm caused by the jury charge has been neutralized by the other instructions given at the trial such that reasonable jurors would not have been misled by the error.'" United States v. Whyte, 928 F.3d 1317, 1332 (11th Cir. 2019) (quoting United States v. Duncan, 855 F.2d 1528, 1532 (11th Cir. 1988)); see also Pepe, 747 F.2d at 675 ("Jury instructions will not be reversed for plain error unless the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice . . . .") (quotation marks omitted and emphasis added); Lamb v. Jernigan, 683 F.2d 1332, 1339 (11th Cir. 1982) ("[I]n determining the effect of an instruction on the validity of a conviction, a single instruction may not be judged in artificial isolation, but must be viewed in the context of the overall charge.") (cleaned up). If another instruction the court gave neutralized the error, then it was not an error at all, let alone a reversible plain error.[12]

---

[12] An instructional error that is cured by another instruction the court gave actually is not an error at all, let alone a plain one, because the charge as a whole does not misinform the jury or prejudice the defendant. See United States v. Shabazz, 887 F.3d 1204, 1220 (11th Cir. 2018) ("We must consider the jury charge as a whole, and we may reverse only if we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.") (quotation marks omitted); United States v. Seabrooks, 839 F.3d 1326, 1333 (11th Cir. 2016) ("We review jury instructions to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party.") (quotation marks omitted).

Nor does such an asserted "error" affect a defendant's substantial rights. See Whyte, 928 F.3d at 1333 ("In the light of the entirety of the instructions given, the omission of the element of

We also consider whether the prejudicial effect was minimized or neutralized by "the manner in which the case was tried," Jones v. Smith, 772 F.2d 668, 673 (11th Cir. 1985), including the attorneys' arguments and the court's statements to the jury.  See United States v. Seabrooks, 839 F.3d 1326, 1333 (11th Cir. 2016) ("[T]he Supreme Court has admonished that 'in reviewing jury instructions, our task is also to view the charge itself as a part of the whole trial,' noting that '[o]ften isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial.'") (second alteration in original) (quoting United States v. Park, 421 U.S. 658, 675–76 (1975)); cf. United States v. Reed, 941 F.3d 1018, 1021 (11th Cir. 2019) ("As the reviewing court, we may consult the whole record when considering the effect of any error on [the defendant's] substantial rights.") (cleaned up) (quoting United States v. Vonn, 535 U.S. 55, 59 (2002)); Whyte, 928 F.3d at 1333 (holding that an asserted jury instruction omission was not reversible plain error in part because the indictment, which was provided to the jury during its deliberations, contained the omitted element).

---

a commercial sex-act from the numbered list did not constitute plain error. . . .  [A]ny potential harm caused by failing to include the element in the numbered list was cured by providing the other instructions and the indictment to the jury."); Duncan, 855 F.2d at 1533 ("Because the jury was instructed by the trial judge both at the beginning of the trial and in his final closing instructions that all of the essential elements of § 1201 had to be proven, the defendant was not prejudiced by the asserted error in the jury charge.  Any such error would be harmless in the context of this case.").

And even if the unobjected to error retained some prejudicial impact, reversal still may not be warranted.  To show that an instructional error affected his substantial rights, a defendant must show that the error "was probably responsible for an incorrect verdict."  Whyte, 928 F.3d at 1332 (quoting Montgomery v. Noga, 168 F.3d 1282, 1294 (11th Cir. 1999)); accord Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1330–31 (11th Cir. 1999) (stating that to be a reversible plain error, an instruction error "must be so prejudicial as to have affected the outcome of the proceedings," and holding that the error did not because "[t]he record plainly shows that no dispute existed over" the element omitted from the instructions) (quotation marks omitted); see Rodriguez, 398 F.3d at 1299 ("The standard for showing [an effect on substantial rights] is the familiar reasonable probability of a different result formulation, which means a probability sufficient to undermine confidence in the outcome.") (quotation marks omitted).

If the defendant's guilt would have been clear under the correct instruction, he loses under the substantial rights third prong of plain error review because he has failed to carry his burden of showing a reasonable probability of a different result but for the error.  See United States v. Barrington, 648 F.3d 1178, 1193–94 (11th Cir. 2011); Rodriguez, 398 F.3d at 1299.  And he also loses under the fourth prong.  See Johnson v. United States, 520 U.S. 461, 469–70 (1997); United States v. Vernon, 723 F.3d 1234, 1263 (11th Cir. 2013) (citing Johnson, 520 U.S. at 470).

43

C.  The Section 841(a)(1) Jury Instructions

On Counts 2 through 4, Iriele contends that the district court failed to instruct the jury that to convict a pharmacist under § 841(a)(1) the government must prove the pharmacist knew that a physician issued the prescriptions without a legitimate medical purpose or outside the usual course of professional practice. Five times during its instructions on the standard for convicting pharmacists under § 841(a)(1), the district court stated either explicitly or implicitly that the question was whether the pharmacist (and not the prescribing physician) acted without a legitimate medical purpose or outside the usual course of professional practice.

Iriele is right that the court did not correctly instruct the jury on the standard for convicting a pharmacist under § 841(a)(1). As we have already explained, see Part IV.A.1, supra, our precedent establishes that "to convict a licensed pharmacist under section 841(a)(1), the government must prove that the pharmacist filled a prescription knowing that a physician issued the prescription without a legitimate medical purpose or outside the usual course of professional practice." Joseph, 709 F.3d at 1094. The district court never conveyed that requirement to the jury. Instead, it instructed the jury on the standard applicable to physicians as if it also applied to pharmacists. See id. (explaining that "[t]o convict a licensed physician under section 841(a)(1), it is incumbent upon the government to prove that he dispensed controlled substances for other than legitimate medical purposes in the

44

usual course of professional practice, and that he did so knowingly and intentionally") (cleaned up). Our decision in Joseph and the former Fifth Circuit's decision in United States v. Hayes, 595 F.2d 258, 261 (5th Cir. 1979), make this instruction error plain. See Frank, 599 F.3d at 1239 (explaining that an error is plain if binding precedent "specifically resolve[s] the issue").

But those are only the first two plain error hurdles, and Iriele cannot clear the other two. The facts elicited at trial, which we have already discussed, see Part IV.A.1, supra, prove overwhelmingly that Iriele knew the AMARC defendants were issuing prescriptions without a legitimate medical purpose and outside the usual course of professional practice, which is the required standard. In light of that proof, Iriele has not shown that the asserted error "was probably responsible for an incorrect verdict." Whyte, 928 F.3d at 1332. He has not undermined our confidence in the outcome. And for the same reason, Iriele cannot show that the district court's error seriously affected the fairness, integrity, or public reputation of judicial proceedings. See Johnson, 520 U.S. at 469–70.[13]

---

[13] The government asserts, for the first time on appeal, that the standard applicable to pharmacists under § 841(a)(1) does not apply to Iriele because at the time of the relevant events his pharmacy license had been revoked. As a result, Iriele could not legally dispense controlled substances for any purpose. In the government's view, that means Iriele was not entitled to an instruction on the standard for convicting a pharmacist under § 841(a)(1). We need not decide whether the government is right about that because even assuming, as we do, that Iriele should have been measured by the standard applicable to pharmacists, his argument fails.

### D. The Money Laundering Jury Instructions

Count 23 charged Iriele with violating § 1956(h) by conspiring to commit money laundering and Counts 24 through 26 charged Iriele with violating § 1957 by committing the substantive offense of financial transaction money laundering. Iriele contends that the district court "erred by entirely failing to instruct the jury" on § 1956(h) and § 1957. His statement of the issue is not totally accurate, but it's not that far off, either — the district court's instructions briefly described the § 1956(h) and § 1957 charges, but the court failed to give the jury separate offense instructions containing the elements of each charge. But under plain error review, that was not a reversible plain error.

### 1. Conspiracy to Commit Money Laundering

In Count 23 the indictment charged Iriele with conspiring to commit promotional, financial transaction, concealment, and structuring money laundering in violation of § 1956(h). Iriele correctly points out that the district court did not separately instruct the jury on the elements of § 1956(h). Early in its instructions the court told the jury:

> Count 23 charges that [Iriele] knowingly conspired to conduct financial transactions affecting interstate commerce which involved the proceeds of the illegal distributing and dispensing of controlled substances outside the course of professional practice and for other than a legitimate medical purpose, to conceal and disguise the nature and source, ownership, and control of the proceeds of this unlawful activity, and to avoid a transaction reporting requirement under Federal law. Count 23 also charges that [Iriele] knowingly conspired to engage in

monetary transactions, by, through, or to a financial institution, affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000.00.

The court also told the jury that Count 23 did not charge Iriele with committing a substantive offense, but instead with conspiring to commit an offense. Those were the only times the court in its jury instructions mentioned Count 23 or conspiracy to commit money laundering; the court never expressly set out the elements of the offense. But the jury instructions, when viewed as a whole, nonetheless conveyed almost everything Iriele wanted the jury to know about those elements.

Iriele's requested jury instruction on § 1956(h), which tracked the Eleventh Circuit Criminal Pattern Jury Instruction on that provision, contained the following: (1) a statement that it's a federal crime to conspire to engage in money laundering; (2) a list of the elements of the substantive money laundering provisions in § 1956 and § 1957; (3) a definition of the word "conspiracy"; (4) an explanation that the government need not prove that all people named in the indictment were members of the conspiracy, that those who were members made any kind of formal agreement, or that the plan succeeded; (5) the elements of conspiracy; (6) a statement that a person can be a conspirator even if he did not know all the details of the unlawful plan, did not know all of the other coconspirators, or played only a minor role in the plan; and (7) a statement that a person is not guilty of conspiracy merely because he was present at the scene of an

47

event, associated with certain people, or inadvertently acted to further the conspiracy. See 11th Cir. Crim. Pattern Jury Instructions O74.5 (2020).[14] (Notice that the law in omitted instruction points (1), (4), and (6) is entirely favorable to the government, not to Iriele.)

Nearly all of those seven points of law were included somewhere in the jury instructions that were given. Item 1 was covered by the court's explanation that Iriele had been charged with conspiracy to commit money laundering. That instruction would have informed a reasonable jury that conspiracy to commit money laundering is a federal crime.

Items 3 through 7, the standard conspiracy instructions, were covered when the court instructed the jury on the charge of conspiracy to distribute a controlled substance. The court defined the term "conspiracy" as "an agreement by two or more persons to commit an unlawful act." It explained that "[t]he Government does not have to prove that all of the people named in the indictment were members of the plan, or that those who were members made any kind of formal agreement," or "that the conspirators succeeded in carrying out the plan." The court also explained that "[a] person may be a conspirator even without knowing

---

[14] We need not, and do not, decide whether all of those instructions are necessary to properly instruct a jury on § 1956(h). But they are sufficient. Cf. United States v. Horner, 853 F.3d 1201, 1210 (11th Cir. 2017) (holding that a particular instruction, which was based on the Eleventh Circuit Criminal Pattern Jury Instructions, was a correct statement of the law but was not the only correct way to instruct a jury on the relevant offense).

all the details of the unlawful plan or the names and identities of all the other alleged conspirators." [15]  A reasonable jury could have inferred from the elements of conspiracy to distribute a controlled substance that the elements of conspiracy to commit money laundering are similar: that there was an unlawful plan made by two or more people, and that the defendant knew of and participated in that plan.

The court did expressly instruct the jury on the elements of promotional money laundering, concealment money laundering, and structuring money laundering, covering most of item 2.  As a result, the court's omission of a separate instruction on § 1956(h) was mostly cured by other instructions the court gave. See Whyte, 928 F.3d at 1332–33.

The district court did not, however, completely cover item 2.  As we will discuss soon, the court did not convey to the jury everything the Eleventh Circuit Criminal Pattern Jury Instructions say about the elements of financial transaction money laundering.  See Part V.D.2, infra.  But Iriele has not shown that the court's failure to do so affected his substantial rights.  He hasn't shown a reasonable probability that the asserted error affected the outcome of the proceedings — he

---

[15] Even if the court hadn't explained those points about what the government need not prove and what a conspirator need not know, Iriele couldn't complain about the court's omissions because all of those instructions helped the government.  Which means that by omitting them, the district court would have helped Iriele.  Such an error could not have affected Iriele's substantial rights.  See Rodriguez, 398 F.3d at 1300 ("[I]f it is equally plausible that the error worked in favor of the defense, the defendant loses . . . ."); cf. United States v. Thomas, 8 F.3d 1552, 1563 n.24 (11th Cir. 1993) ("[A]ny error in the court's instructions benefitted appellants and was therefore harmless.").

hasn't undermined our confidence in the outcome of the trial.  See Farley, 197 F.3d at 1330 ("[T]he error of law must be so prejudicial as to have affected the outcome of the proceedings.") (quotation marks omitted); Rodriguez, 398 F.3d at 1299 (requiring a reasonable probability of a different result, meaning one sufficient to undermine our confidence in the outcome).  The evidence at trial, which we have already discussed, see Part IV.C, supra, proved overwhelmingly that Iriele conspired with Ofume to commit promotional money laundering.  Iriele has failed to show a reasonable probability that he would not have been convicted of Count 23 based on that evidence regardless of whether he also conspired to commit financial transaction money laundering.  See Feldman, 936 F.3d at 1307–08.  He has failed to undermine our confidence in the outcome regarding Count 23.[16]

## 2.  Financial Transaction Money Laundering

Counts 24 through 26 charged Iriele with financial transaction money laundering in violation of § 1957.  Those charges were based on Iriele's use of MCP funds to purchase three luxury vehicles in his children's names.  Iriele argues

---

[16] In addition to the court's instruction on the elements of promotional money laundering, the government's closing argument provided the jury with extra guidance on that crime.  The government explained: "Promotion, that's paying the pharmaceutical companies. . . .  They paid the pharmaceutical companies for more pills to keep the pill mill churning."

It's also worth mentioning that the government did not rely on a theory of financial transaction money laundering in arguing the conspiracy charge to the jury; instead, it relied on theories of promotional, concealment, and structuring money laundering.  All of those factors suggest that the district court's failure to give a complete instruction on financial transaction money laundering did not affect Iriele's substantial rights.  See Reed, 941 F.3d at 1021 (we may consult the entire record when gauging the effect, if any, of an error on the outcome of the trial).

that the district court did not instruct the jury separately on financial transaction money laundering, and he's right. The only mention of the financial transaction money laundering charges came early in the court's jury instructions, when the court said: "Counts 24, 25, [and] 26 charge that [Iriele] knowingly engaged in a monetary transaction affecting interstate commerce and foreign commerce in criminally derived property that was of a value greater than $10,000.00." As with Count 23, the court never separately and expressly set out the elements of the relevant crime. But as with Count 23, that omission was not reversible plain error.

Iriele's requested instruction on § 1957, which tracked the Eleventh Circuit Criminal Pattern Jury Instruction on that provision, contained the following: (1) a statement that it's a federal crime to engage in money laundering; (2) the elements of financial transaction money laundering, which we will discuss below; (3) definitions of the terms "monetary transaction," "financial institution," and "proceeds"; (4) a statement that it doesn't matter whether the defendant knew the precise nature of the crime the property was derived from, so long as he knew that the property was derived from committing some crime; and (5) an explanation that it doesn't matter whether all of the property involved was criminally derived, as long as at least $10,000 worth was. See 11th Cir. Crim. Pattern Jury Instructions O74.6 (2020).

Nearly all of those points of law were included somewhere in the district court's jury instructions. We will start with items 1, 3, and 4, which the district court's jury instructions actually did cover. As to item 1, the court told the jury in its instructions on other forms of money laundering that it's a federal crime to engage in money laundering. As to item 3, the court expressly defined "financial institution" and "proceeds" at different places in the jury instructions. And although the court did not expressly define the term "monetary transaction" for the jury, its explanation of Count 23 essentially defined that term. A "monetary transaction" is a deposit, withdrawal, transfer, or exchange of funds "by, through, or to a financial institution in a way that affects interstate commerce." 11th Cir. Crim. Pattern Jury Instructions O74.6 (2020). The court conveyed that idea when it instructed the jury that Count 23 charged Iriele with conspiring to, among other things, "engage in monetary transactions, by, through, or to a financial institution, affecting interstate and foreign commerce." (Emphasis added.) And item 4 was covered by the court's instructions on other forms of money laundering, which stated that Iriele need have known only that the property involved in the transaction was derived from committing some crime, even if he did not know what specific crime it was derived from.

Item 2 involves the substantive elements of financial transaction money laundering. Those elements are: (a) the defendant knowingly engaged or

52

attempted to engage in a monetary transaction; (b) the defendant knew the transaction involved property or funds that were the proceeds of some criminal activity; (c) the property had a value of more than $10,000; (d) the property was in fact proceeds of the unlawful distribution of controlled substances; and (e) the transaction took place in the United States.  11th Cir. Crim. Pattern Jury Instructions O74.6 (2020).

The court told the jury the following about financial transaction money laundering: "Counts 24, 25, [and] 26 charge that Defendant Donatus Iriele knowingly engaged in a monetary transaction affecting interstate commerce and foreign commerce in criminally derived property that was of a value greater than $10,000.00."  That statement conveyed to the jury that to convict Iriele, it had to find that he knowingly engaged in a monetary transaction involving criminally derived property of a value greater than $10,000 — covering elements (a), (c), and (d).[17]  The court's instructions on other forms of money laundering informed the

_____

[17] As if that weren't enough, the government also presented an expert witness who discussed the different types of money laundering under the United States Code.  The jury heard the following exchange:

Q. Is there also a kind of money laundering that is done in violation of 1957?  And if so, could you describe it to the jury?

A. Okay.  1957 on your Title 18 is commonly referred to as financial transaction money laundering.  And that is where a transaction has to exceed $10,000 and it's conducted by, through or to a financial institution as defined by that statute.  And financial institution under that statute . . . includes car dealers. . . .  The key, again,

53

jury that to prove Iriele knowingly engaged in a transaction involving criminally derived proceeds, the government had to prove both that the proceeds were actually criminally derived and that Iriele knew it.  That covered element (b) and clarified what the court had said about element (d).

The court did not, however, cover element (e), which is that the monetary transaction had to have taken place within the United States.  See 18 U.S.C. § 1957(d).  But that was not reversible plain error because Iriele has not shown that it affected his substantial rights.  To the contrary, the evidence at trial established overwhelmingly Iriele's guilt on the omitted element.  Counts 24 through 26 charged that Iriele had used money from the MCP bank account to purchase luxury vehicles in his children's names.  The government introduced wire transfer records showing that Iriele initiated those wire transfers in the United States and that the recipient car dealerships were also located in the United States.  And Iriele did not dispute at trial whether the wire transfers were made in the United States.  As a result, he has not shown that the court's omission of one element from its

---

is that the transaction has to exceed $10,000 and it has to travel to or come from or go through one of those financial institutions.

Q.  And does the $10,000 have to be in criminally-derived property?

A.  It does.

The government correctly explained during its closing argument that the witness's testimony about the law could not trump the district court's instructions about the law.  But to the extent the court's jury instructions omitted any of the basics about financial transaction money laundering, the witness's testimony could help fill in the gaps for plain error purposes.

instruction on § 1957 affected his substantial rights or the fairness, integrity, or reputation of judicial proceedings.  See Johnson, 520 U.S. at 469–70; Barrington, 648 F.3d at 1193–94.

Finally, there is item 5.  The court's jury instructions did not tell the jury that it doesn't matter whether all of the property involved in the alleged money laundering was criminally derived, as long as at least $10,000 worth of it was.  But Iriele cannot complain about the court's failure to give that instruction because the asserted error worked in his favor: the instruction, if given, would have helped the government.  So if that was an error, it did not affect Iriele's substantial rights; it affected the government's rights.  See Rodriguez, 398 F.3d at 1300 ("[I]f it is equally plausible that the error worked in favor of the defense, the defendant loses . . . ."); cf. United States v. Thomas, 8 F.3d 1552, 1563 n.24 (11th Cir. 1993) ("[A]ny error in the court's instructions benefitted appellants and was therefore harmless.").

In summary, there were no preserved errors in the jury instructions and no unpreserved ones that meet the strictures of the plain error rule.

## VI.  CONCLUSION

For the reasons stated, we affirm the conviction.

**AFFIRMED.**